**MAIN PLACE CUSTOM HOMES, INC. and Ron Smith, Appellants,**

v.

**Richard HONAKER and Ginger Honaker, Appellees.**

**No. 2–04–275–CV.**

Court of Appeals of Texas, Fort Worth.

March 23, 2006.

Rehearing Overruled April 20, 2006.

---

4. *See* Tex.R.App. P. 47.1.

Cooper & Scully, P.C., R. Brent Cooper, Diana L. Faust, Devon J. Singh, Dallas, for appellants.

Timothy G. Chovanec, Fort Worth, Cheryl C. Turner, Bragg, Chumlea, McQuality, Mark S. McQuality, Dallas, for appellees.

PANEL B: LIVINGSTON, GARDNER, and WALKER, JJ.

## OPINION

TERRIE LIVINGSTON, Justice.

### Introduction

This case involves a homeowners' suit against a builder and its owner in connection with a slope failure and related soil movement that occurred on the homeowners' property, damaging their property and home. In ten issues,[1] appellants contend that the trial court's failure to make additional requested findings of fact and conclusions of law prevents them from properly presenting their case to this court; that the evidence is legally and factually insufficient to support certain of the trial court's findings; that the trial court abused its discretion by ordering appellants to turn over "[t]he insurance policy, declarations, and all documents related [to] Great American Lloyds policy PAC–982–01–64–01" and "[a]ll insurance claims or causes of action of [appellants] pursuant to [that] policy"; that the trial court's award of prejudgment interest should be vacated; and that the mental anguish damages award should be reversed because it is not segregated between the appellees, Richard and Ginger Honaker. We modify the judgment in part and affirm it as modified.

### Background Facts

In 1997, appellant Main Place Custom Homes, Inc. bought a lot in the Stonebriar subdivision of Frisco. Main Place was owned by appellant Ron Smith and his ex-wife Maxine Smith. Main Place built a custom luxury home on the property.[2] It was the first "million dollar" home that Main Place had built.

Appellees Richard and Ginger Honaker first saw the home in 1998 while it was under construction. They were impressed with the view from the back of the home, from which a steep embankment overlooks a creek and golf course.[3] Richard was concerned about the steep slope of the embankment and asked Smith whether the home would slide off the hill. Smith told Richard that the "house and lot [are] as solid as they come," that "he built homes on solid lots," that the property "was stable and ... there would be no problems with the house or property falling away," and that Smith was "used to building solid homes that did well." Smith made these representations before, during, and after the Honakers contracted to purchase the home. Richard testified that he relied on these statements in purchasing the property.

The Honakers signed an agreement to buy the property on February 15, 1998.

---

1. In appellants' list of issues presented, they bring two additional issues, which they did not brief. It appears that these issues are contingent upon our disposition of their other issues. But because appellants' eleventh and twelfth issues are not briefed, they are waived. *See Shelton v. Sargent*, 144 S.W.3d 113, 119 (Tex.App.-Fort Worth 2004, pets. denied).

2. Smith referred to the home as a "spec" home.

3. The home is located on the middle of the lot, and the back of the home faces south. There is a swimming pool behind the home, and the embankment is located south of the pool, on the southern most part of the property.

They included a provision in the contract requiring Main Place to provide them with engineering reports about the retaining wall on the south end of the property and on the foundation. Smith provided them with two letters,[4] both of which opined that the retaining wall was strong enough to withstand the pressure of the built-up foundation. Neither letter mentioned any problems with the soil on which the home was built. After receiving the letters, Richard asked Smith if any further reports were necessary about "the grading and the stability of the land and the home." Smith told Honaker that no further reports were necessary.

The Honakers closed on the property on November 23, 1998. In August 2000, the soil on the south side of the foundation began cracking and pulling away from the back porch. Smith came to the house at Richard's request to look at the cracking. Smith told Richard that the problem was "normal settling" and to fill the area with sand. He also told Richard that the cracking was not a problem.

On November 6, 2000, the slope behind the home failed and caused a major landslide. Smith came out to look at the damage and told Richard that the slope failure would not damage the home. Over the next several months, however, the property sustained damage related to the slope failure, such as cracking in the pool, cracking in the drywall, damage to the retaining wall, a shattered picture window, cracked tile, heaving of the foundation, and further movement in the soil. The Honakers had to hire engineers to investigate the problems. They were also forced to pay damages to their homeowners' association because the contractor they hired to fix the retaining wall encroached on the homeowners' association's easement. Richard testified that the damage to the home was so great—and was continuing at such a rate—that there was a stigma attached to the home that prevented the Honakers from selling it, except for much less than the property was worth.

The Honakers eventually discovered that the home's sprinkler system had been improperly connected to the city water hookups, causing thousands of gallons of water to leak under the home. The engineering reports they obtained advised that this water leakage would not have been a problem but for the soil that the home was built on. The home was built at the joining of two different types of soil: one being stable and the other being very unstable. The joining of the two, combined with the excessive amount of water, caused movement in the soil that the home was built on.

Several months after discovering the sprinkler leak, the Honakers filed suit against appellants; Stonebriar Residential Joint Venture, Hillwood/Stonebriar Residential, Ltd., and Hillwood Property Company f/k/a Hillwood Clubs, Inc., the initial developers of the property (collectively referred to as the developer); Larry Smith, L.F.S. Construction, Inc., and L.F.S. Systems, Ltd., and Larry F. Smith, Inc., the contractor whom Richard hired after the slope failure to repair the retaining wall; Marc Wilson d/b/a Texas Green, the subcontractor who installed the sprinkler system; and Chubb Lloyds Insurance Company of Texas, the Honakers' homeowners' insurance company. The Honakers settled their claims against all parties except appellants, and the trial court dismissed the claims against those parties with prejudice. Thus, the Honakers proceeded to trial on

---

4. The letters were from Parrent Concrete, Inc., whom Main Place had hired to design the home's foundation, and Falkofske Engineering, Inc., whom Main Place hired to examine the main retaining wall along the south side of the property.

their DTPA, fraud in a real estate transaction, breach of warranty, negligent misrepresentation, and negligence claims against Main Place, and DTPA, fraud in a real estate transaction, negligent misrepresentation, and negligence claims against Smith.

After a bench trial, the trial court found in favor of the Honakers and signed a judgment awarding them approximately $800,000. In addition to awarding the Honakers damages, prejudgment interest, and attorney's fees for both the trial and any appeals, the judgment ordered appellants to deliver to the Honakers "[t]he insurance policy, declarations, and all documents related [to] Great American Lloyds policy PAC–982–01–64–01" and "[a]ll insurance claims or causes of action of [appellants] pursuant to Great American Lloyds policy PAC–982–01–64–01." It further ordered that the Honakers "shall be assigned to and have the right to pursue action against Great American Lloyds policy PAC–982–01–64–01 as a third party beneficiary and assignee of [appellants]."

Appellants filed a request for findings of fact and conclusions of law. On July 22, 2004, the trial court filed findings of fact and conclusions of law, and appellants responded by requesting additional findings of fact and conclusions of law. The trial court signed an amended final judgment on September 7, 2004, reducing the damages originally awarded by $30,000, the amount of a settlement credit for the settlements with the developer and Marc Wilson. Appellants then filed a further additional request for findings of fact and conclusions of law based on the amended final judgment. The trial court signed amended findings of fact and conclusions of law on October 4, 2004 and March 15, 2005. Those amended findings include some, but not all, of the additional findings requested by appellants.

## Findings of Fact and Conclusions of Law

In their first issue, appellants contend that the trial court erred by failing to make all of the additional findings of fact and conclusions of law that they requested based on the amended final judgment because the trial court's failure to do so prevents them from adequately presenting their appeal. Specifically, appellants complain about the trial court's failure to quantify the amount of damages caused by each appellant under each theory of liability.

 A trial court is required to file findings of fact and conclusions of law within twenty days after a timely request is made. *See* TEX.R. CIV. P. 297. Upon a party's timely request for additional findings, the trial court "shall file any additional or amended findings and conclusions that are appropriate." TEX.R. CIV. P. 298. Additional findings are not required if the original findings and conclusions "properly and succinctly relate the ultimate findings of fact and law necessary to apprise [the party] of adequate information for the preparation of [the party's] appeal." *Balderrama v. W. Cas. Life Ins. Co.*, 794 S.W.2d 84, 89 (Tex.App.-San Antonio 1990), *rev'd on other grounds*, 825 S.W.2d 432 (Tex. 1991); *see Jamestown Partners, L.P. v. City of Fort Worth*, 83 S.W.3d 376, 386 (Tex.App.-Fort Worth 2002, pet. denied); *In re Marriage of Morris*, 12 S.W.3d 877, 886 (Tex.App.-Texarkana 2000, no pet.); *Finch v. Finch*, 825 S.W.2d 218, 221 (Tex. App.-Houston [1st Dist.] 1992, no writ). An ultimate fact is one that would have a direct effect on the judgment. *Morris*, 12 S.W.3d at 886. If the refusal to file additional findings does not prevent a party from adequately presenting an argument on appeal, there is no reversible error. *Jamestown Partners*, 83 S.W.3d at 386; *Johnston v. McKinney Am., Inc.*, 9 S.W.3d

271, 277 (Tex.App.-Houston [14th Dist.] 1999, pet. denied). If the requested findings will not result in a different judgment, the findings need not be made. *Johnston,* 9 S.W.3d at 277.

Here, the Honakers contend that "if the findings of fact in the case at bar are sufficient to uphold the judgment under *any* of the causes of action pled by Honaker, a different judgment does not result." Appellees brought five causes of action against Main Place and four causes of action against Smith. In the second amended findings and conclusions, the trial court found and concluded that Smith and Main Place violated the DTPA—which included a finding that Main Place breached the implied warranty of good and workmanlike construction—and made negligent misrepresentations in connection with the sale of the home, that Smith was liable for fraud in a real estate transaction, and that Main Place breached its contract with the Honakers and was negligent in designing, constructing, warranting, and repairing the home. In its conclusions in the Second Amended Findings of Fact and Conclusions of Law, the trial court did not assign damage findings to each cause of action; instead, the trial court concluded as follows:

23.1 [The Honakers] proved reasonable and necessary cost of repair damages in the amount of $221,585.06.

23.2 [The Honakers] proved permanent reduction in market value after repairs are made in the amount of $300,000.00.

23.3 [The Honakers] proved special damages in the amount of $12,533.05 [the amount they paid to the homeowners' association for encroachment on the easement].

23.4 [The Honakers] proved out of pocket expenses in the amount of $5,229.93.

23.5 [The Honakers] proved mental anguish damages in the amount of $50,000.00.

23.6 [The Honakers], having prevailed on several causes of action, are entitled to costs of court.

The trial court further concluded that the Honakers, "having prevailed on their DTPA and Breach of Contract causes of action, are entitled to attorney's fees" of $237,736.45, plus $15,000 for an appeal to the court of appeals and $10,000 for an appeal to the supreme court.

■ If a plaintiff pleads multiple theories of recovery for a single injury and does not elect its remedies before the trial court proceeds to judgment, the trial court should render the judgment offering the greatest recovery. *Birchfield v. Texarkana Mem'l Hosp.,* 747 S.W.2d 361, 367 (Tex.1987). If the trial court does not do so, the appellate court must use the findings awarding the greatest theory of recovery and render judgment accordingly. *Citizens Nat'l Bank v. Allen Rae Investments, Inc.,* 142 S.W.3d 459, 475 (Tex. App.-Fort Worth 2004, no pet.) (op. on reh'g).

■ Here, the DTPA allows the greatest recovery. The trial court awarded economic damages, mental anguish damages, and attorney's fees. All three are recoverable under the DTPA. *See* Tex. Bus. & Com.Code Ann. § 17.50(d) (Vernon Supp.2005). Mental anguish damages are not recoverable for breach of contract, *Latham v. Castillo,* 972 S.W.2d 66, 72 (Tex. 1998), and attorney's fees are not recoverable for the Honakers' fraud in a real estate transaction, negligence, and negligent misrepresentation claims, *see* Tex. Civ. Prac. & Rem.Code Ann. § 38.001 (Vernon 1997). And the Honakers could not recover attorney's fees from Smith under any theory other than DTPA because he was not a

party to the contract for the sale of the home. *See id.*[5] Appellants have fully briefed their complaints on appeal with respect to the Honakers' DTPA claims.[6] Consequently, if the trial court's judgment can be upheld under the DTPA, no additional findings are necessary. *See Citizens Nat'l Bank,* 142 S.W.3d at 475; *Jamestown Partners,* 83 S.W.3d at 386. We will therefore first address appellants' issues challenging the sufficiency of the evidence to support the Honakers' recovery under the DTPA before disposing of appellants' first issue.

### Legal and Factual Sufficiency

In appellants' second through fifth issues, they claim that the evidence is legally and factually insufficient to support the trial court's findings and conclusions on the percentage of responsibility apportioned among appellants and the settling defendants, the attorney's fees award, DTPA "laundry list" violations, and the "knowing" element of the DTPA violations.

### Standard of Review

Findings of fact entered in a case tried to the court have the same force and dignity as a jury's answers to jury questions. *Anderson v. City of Seven Points,* 806 S.W.2d 791, 794 (Tex.1991). The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence to support them by the same standards that are applied in reviewing evidence supporting a jury's answer. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex.1996); *Ca-*

*talina v. Blasdel,* 881 S.W.2d 295, 297 (Tex.1994).

A legal sufficiency challenge may only be sustained when: (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 334 (Tex.1998), *cert. denied,* 526 U.S. 1040, 119 S.Ct. 1336, 143 L.Ed.2d 500 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 TEX. L. REV. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could, and disregard evidence contrary to the finding unless a reasonable factfinder could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005).

Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cont'l Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 450 (Tex.1996); *Leitch v. Hornsby,* 935 S.W.2d 114, 118 (Tex.1996). When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *Kindred v. Con/Chem, Inc.,*

**5.** Appellants also contend that Smith cannot determine his responsibility under the amended final judgment for attorney's fees because the trial court concluded that the Honakers were entitled to attorney's fees under both the DTPA and section 38.001 (for the breach of contract). Because we must first determine whether the award of attorney's fees is sup-

portable under any theory, we will discuss this contention in our disposition of appellants' third issue.

**6.** Appellants do not contend that they have been unable to adequately present their challenges to the judgment on the Honakers' DTPA claims.

650 S.W.2d 61, 63 (Tex.1983). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex.2002).

▆▆▆▆ Any ultimate fact may be proved by circumstantial evidence. *Russell v. Russell*, 865 S.W.2d 929, 933 (Tex. 1993). A fact is established by circumstantial evidence when the fact may be fairly and reasonably inferred from other facts proved in the case. *Id.* However, to withstand a legal sufficiency challenge, circumstantial evidence still must consist of more than a scintilla. *Blount v. Bordens, Inc.*, 910 S.W.2d 931, 933 (Tex.1995).

▆▆▆▆ An assertion that the evidence is factually insufficient to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). We are required to consider all of the evidence in the case in making this determination, not just the evidence that supports the finding. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex.), *cert. denied*, 525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998). When conducting a factual sufficiency review, a court of appeals must not merely substitute its judgment for that of the trier of fact. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex.2003). The trier of fact is the sole judge of the credibility of witnesses and the weight to be given to their testimony. *Id.*

▆▆▆▆ Unchallenged findings of fact are binding unless the contrary is estab-

lished as a matter of law or there is no evidence to support the findings. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex.1986); *Reliance Ins. Co. v. Denton Cent. Appraisal Dist.*, 999 S.W.2d 626, 629 (Tex.App.-Fort Worth 1999, no pet.). Conclusions of law may not be challenged for factual sufficiency, but they may be reviewed to determine their correctness based upon the facts. *Dominey v. Unknown Heirs & Legal Representatives of Lokomski*, 172 S.W.3d 67, 71 (Tex.App.-Fort Worth 2005, no pet.); *Rogers v. City of Fort Worth*, 89 S.W.3d 265, 277 (Tex. App.-Fort Worth 2002, no pet.).

**Proportionate Responsibility Findings**

▆▆▆▆ In their second issue, appellants contend that to the extent the trial court's basis for recovery under the judgment is based on the DTPA, the evidence is legally and factually insufficient to support finding of fact 17.1.[7] In finding of fact 17.1, the trial court set forth the percentage of responsibility for each party that caused the Honakers' damages: Main Place 60%, Smith 20%, Wilson 20%, and the Honakers and the developer 0%. According to appellants, "[t]he overwhelming weight of the evidence is that Texas Green's improper installation of the sprinkler system caused the Sprinkler Leak, which … was the 'primary cause' of the slope failure and the damages sought" by the Honakers. They claim that the evidence shows that the development of the lot before Main Place purchased it was the secondary cause of the slope failure and that Smith relied on subcontractors to design the foundation when developing the lot and on their expertise in determining the appropriate building standards to do so. According to appellants, "the sole testimony is that Tex-

---

7. On page 17 of their brief, appellants attack only the factual sufficiency of the evidence, but on page 22, they attack both the legal and

factual sufficiency of the evidence. Thus, we will review the evidence under both standards.

as Green or the developer caused the damages."

To prevail on a DTPA cause of action, a plaintiff must prove that the defendant's misrepresentations were the producing cause of the plaintiff's injuries. TEX. BUS. & COM.CODE ANN. § 17.50(a); *Alexander v. Turtur & Assocs., Inc.,* 146 S.W.3d 113, 117 (Tex.2004). Producing cause requires that the acts be both a cause-in-fact and a "substantial factor" in causing the injuries. *Brown v. Bank of Galveston, Nat'l Ass'n,* 963 S.W.2d 511, 514 (Tex.1998); *Union Pump Co. v. Allbritton,* 898 S.W.2d 773, 775 (Tex.1995). A producing cause is an efficient, exciting, or contributing cause, which in the natural sequence of events, produces injuries or damages. *Brown,* 963 S.W.2d at 514; *Haynes & Boone v. Bowser Bouldin, Ltd.,* 896 S.W.2d 179, 182 (Tex.1995). There may be more than one producing cause. *Haynes & Boone,* 896 S.W.2d at 182.

Here, Richard testified about the discovery of the sprinkler leak. According to Richard, when he told Smith that tile was cracking in the northwest bedroom of the house,[8] Smith told him to have a plumber investigate. Richard hired Randy Hite, who found a "pressure problem," consisting of a leak where the sprinkler system connected to the city water valve. Richard said that that part of the work (the sprinkler hookup) had been done by Main Place or its subcontractors in constructing the home.[ ] Apparently, two gallons of water per hour had leaked underground from November 1998 to July or August 2001.

On Smith's recommendation, Richard hired Larry Smith (no relation to Smith) to repair the retaining wall, which had also begun cracking. Larry told Richard that there were several reasons for the slope failure. He said "the land was not scarified nor terraced appropriately, with improper fill[,] and a slip plane had been produced as opposed to a stable fill." According to Larry, this analysis comported with two engineering reports Richard had procured regarding the property (the Reed and Nelson reports).[9] Larry told Richard that that analysis was also consistent with the leaking sprinkler connection. Larry also told Richard that the embankment behind the house was a greater than 3 to 1 slope,[10] and that the slope should be no greater than 3 to 1 according to industry standards. Larry said that vegetation, building materials, and limestone from the front of the lot had been pushed to the back of the lot during construction and that was part of the problem. Richard testified that Larry told him the problem was the fault of a combination of the developer and the builder, Main Place. Richard understood that Larry thought there was a connection between the sprinkler leak and the slope failure and heaving on the west side of the home. Richard believed Smith provided the fill dirt on the property.

When Richard discussed the problems with Smith, Smith told him that he thought he had bought a good lot that was properly stabilized. Richard testified that he thought appellants should have done more detailed engineering to determine the stability of the home.

---

**8.** This occurred after the major slope failure. Richard testified that the property continued to show signs of soil-movement-related damage up until the time of trial.

**9.** Richard obtained these reports after purchasing the property and after the problems with soil movement began.

**10.** In this opinion, all references to slope grades are horizontal to vertical. A "greater" slope, meaning a steeper slope, would actually be 2 to 1, rather than 4 to 1 or higher. The slope on the Honakers' property was a 2 to 1 slope.

Whitney Smith, a geotechnical engineer and Vice President of Reed Engineering Group, testified that the home is located on the Austin Chalk Limestone formation on the northeastern side and on the Eagle Ford Shale formation on the southwestern side. The two formations meet in a "transition area" on the Honakers' property. The lower elevations of the property are mostly Eagle Ford Shale, and the higher elevations are mostly Austin Chalk Limestone overlapping Eagle Ford Shale. Thus, the eastern part of the property is more stable than the western part. According to Whitney, "[t]he vast majority of the landslides and slope failures that [he had] studied in the Dallas/Ft. Worth area have been in the Eagle Ford Shale formation." Whitney testified that before the Honakers' property was developed, the slope was fairly flat, but at some point, fill was put in to raise the back of the lot to level with the front, and a retaining wall was added to restrain the fill. Through Whitney, the Honakers introduced into evidence geotechnical engineering reports from Rone Engineers that had been prepared for the developer. The developer gave these reports to Smith when Main Place first bought the property. Smith did not provide these reports to the Honakers in response to their request for engineering reports about the stability of the property, instead giving them reports from two other engineering firms, opining that the property was stable and the retaining wall was adequate.

Whitney testified that the Rone report contained information that would raise questions about the stability of the lot and that most engineers familiar with the Eagle Ford Shale formation would have concerns after reading the report about slope stability and movement of the Eagle Ford Shale formation. According to Whitney, there was not enough information in the Rone report to properly design a slope on that lot. He would have requested extra soil borings.

The foundation of the home contains piers. According to Whitney, the Rone report does not contain design criteria for the type of foundation that is under the home. Also, the additional borings report provided to Smith by the developer states, "Our findings indicate that the proposed residential buildings could be adequately supported on a stiffened *slab-on-grade* type foundation. The slab may be either grid-type grade beam and slab or post-tensioned slab foundation system." [Emphasis added.] Whitney additionally testified that the Rone report recommended that the site grading plans for construction strive to achieve positive drainage around all sides of the proposed residence, but that when he visited the site, "there [were] some areas that appeared there was not positive drainage." Further, the Nelson report, one of the engineering reports that Richard obtained after the slope failure, indicates that there was not positive drainage around the whole house. Whitney testified that he agreed with the Rone report that "inadequate drainage can cause excessive vertical differential movements to occur." He explained that this means that "if you allow water to pond adjacent to the residence, it can begin to be absorbed by the expansive clays beneath the foundation. When the clays absorb water, they swell and expand and tend to push up on the foundation."

Whitney testified that the slope on the back of the property was significantly steeper than recommended by the Rone report. The Rone report recommended a maximum 3 to 1 slope, but the slope on the property was 2 to 1. Whitney testified that in the Eagle Ford Shale formation, stable slopes are between 4 to 1 and 6 to 1.

Whitney also testified that debris in the fill on the property violated the recommendations in the Rone report, which recommended stripping the landscaping to a minimum depth of 6 inches and scarifying for compaction purposes. Whitney opined that settlement can occur if a significant amount of organics were included in the fill and that that could also affect slope stability. Whitney said he would have wanted many borings before building on such a site. Here, most of the borings were taken toward the street side rather than near the retaining wall where the fill was.

Whitney also testified that the south and west part of the home's foundation was elevated with respect to the north and east part, which showed very little movement. South and west was the direction of the slope failure as well as the direction of the overlap of the two formations.

According to Whitney, "the ground water that accumulated in the back of the property was the primary cause of the land sliding" and was attributable to the sprinkler leak. The leak was in the northwest corner of the property underground in the colluvial layer, which is more permeable than the layers above or below it. It runs downhill along the less permeable underlayer. This water was not attributable to rainfall or other sources. Because of the poor drainage around the property, the ground water was being taken in as storage. The leak was significant to the ground water table.

Whitney testified that a secondary cause of the slope failure was the lack of "[s]pecific investigation of global stability" of the retaining wall before it was designed or after it was designed and before the house was built.

Randy Hite, the plumber who discovered the sprinkler leak, testified about his discovery. He testified that overtightening of the connection between the home sprinkler system and the city water system happens frequently and that a soldered fitting, rather than the PVC pipe that was used, would have been more adequate for the system that was installed.

Smith testified that the first time he saw the site it had already been filled and the retaining walls were up. He never inspected the fill dirt personally, but he obtained density tests from the developer and gave them to Parrent Engineering, the engineer Main Place used to design the home's foundation. The Rone report is one of the density reports the developer gave Main Place. Appellants introduced into evidence the results of an additional boring test Smith requested when Main Place bought the lot from the developer. The developer did not give Smith any other tests when Main Place bought the lot. Smith agreed that Parrent could have done additional testing on the property, but it did not. Smith agreed that the retaining wall was necessary to the stability of the slope and important to the integrity of the property.

Smith testified that Main Place made all the decisions about which subcontractors to hire in building the home. As builder of the "spec" home, Main Place had control over all of the design and building decisions.

When Main Place bought the property from the developer, the contract expressly disclaimed any warranty regarding the fill dirt,[11] but Smith didn't do any further

11. Specifically, the contract provided as follows: "Seller makes no warranties or representations as to the nature of the soil or composition of the subsurface of the Lot and Purchaser acknowledges that the Lot may contain fill dirt or any other substance such that it may not be suitable for the purposes for which Purchaser is acquiring the Lot."

investigations and didn't think he needed to because Parrent told him he didn't. Smith testified that he and Parrent relied entirely on the Rone report and the additional borings report. He told Parrent it had to rely on the Rone report for the design of the home's foundation. Smith said that if Parrent had needed more information than what was in those reports, it would have asked him, and he would have told it to get what it needed. Smith testified that he has no training in reading soil reports and hires others to do the work for him. Here, he relied on Parrent.[12]

Smith said that when he looked at the site, he saw a lot of ground movement, but no foundation movement. Smith did not verify the grading recommendations in the Rone report. He did not review the borings report and the Rone report, and he did not understand the information in them, which is why he gave them to Parrent to review and make recommendations. As to the retaining wall, he said anything over four feet has to be engineered to hold up dirt and that he knew the wall would withstand the dirt because "Metroplex Retaining Wall built it." Smith did not obtain Metroplex's engineering data for the wall.

Richard and Ginger both testified about the representations Smith made before and after they bought the property. Richard testified that when he asked Smith if the home would fall off the hill, Smith said, "That shouldn't be a problem. This house and lot [are] as solid as they come." When Richard asked Smith if the retaining wall was strong enough to do its job on such a big embankment, Smith told him that the wall was properly installed. Smith told the Honakers that "he was used

to building solid homes that did well," took them to another home he built, and "basically showed [them] and told [them] that he built solid homes on solid lots." When Richard first noticed the lawn pulling away from the back porch, Smith told him that he didn't think it was a problem, to keep an eye on it, and to call him if it got worse.

Ginger testified that Smith assured them the home was stable and that the home or property would not fall away. She said they relied on the engineering reports Smith gave them in buying the property. She testified that they were reassured by the reports and didn't know where to get their own.

Considering the entire record, as we must, the evidence shows that there were several different causes of damage to the property, which included not just the slope failure, but also, among other things, heaving in the foundation, failure of the retaining wall, and cracking in the drywall and tile. Specifically, the evidence shows that these damages were caused by the sprinkler leak, poor drainage in the soil around the home, the inclusion of improper fill in the back of the property, improper grading and compaction of the back part of the property, a slope that was steeper than recommended for the soil, and a foundation that was not properly designed for the soil upon which it was built. Thus, the evidence shows multiple problems, all of which ultimately hinge upon the original design and placement of the home on inherently unstable soil.

In addition, the Honakers' DTPA claims are based on the causal connection between Smith's misrepresentations and their damages. Here, both of the Honakers testified that they relied on Smith's

---

**12.** It does not appear from the record that Parrent was ever made a party to the suit, either by appellants or the Honakers.

statements about the stability of the property and on the letters he provided them opining that the home's foundation and the retaining wall were stable. Richard testified that he would not have purchased the property without the engineering reports.[13] This evidence supports the conclusion that but for appellants' misrepresentations, the Honakers would not have incurred damages in connection with the property. *See Kessler v. Fanning,* 953 S.W.2d 515, 519 (Tex.App.-Fort Worth 1997, no pet.). Thus, we hold that the evidence supports the percentages of proportionate responsibility in finding of fact 17.1. We overrule appellants' second issue.

### Attorney's Fees Award

In their third issue, appellants claim that the trial court's award of attorney's fees is not supported by the evidence and that the trial court erred by not segregating fees among the original defendants.

■ Section 17.50(d) of the Texas Business and Commerce Code provides that a party who recovers on a DTPA claim "shall" recover its reasonable and necessary attorney's fees. *See* TEX. BUS. & COM. CODE ANN. § 17.50(d). In determining the reasonableness and necessity of attorney's fees, courts should consider the eight factors recited in rule 1.04 of the rules of professional conduct. TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04(b), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G app. A (Vernon 2005) (TEX. STATE BAR R. art. X, § 9); *Arthur Andersen & Co. v. Perry Equip. Corp.,* 945 S.W.2d 812, 818 (Tex. 1997). Those factors are (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal services prop-

erly; (2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered. *Andersen,* 945 S.W.2d at 818.

The Honakers' trial counsel, Mark McQuality, testified concerning his firm's fees. He testified that this was one of the more difficult, challenging cases he had tried and that he specializes in homeowners' cases. He testified that this was a very personal, emotional case and that the Honakers needed more counseling than normal because of the emotional nature of the case. Also, they were new to litigation. McQuality further testified that the case had been pending for almost two years during which his firm had not been compensated for all of its work on the case.

The Honakers introduced Exhibit 25 into evidence, which is a summary of the total attorney's fees incurred by their counsel, plus all costs and expenses they incurred in connection with the litigation. Exhibit 25 shows that McQuality's firm spent 880.84 hours on the case, for a total of $176,692.40 in fees.[14] McQuality testified that he is familiar with the fees

---

**13.** Richard later equivocated somewhat and said that he didn't know what he would have done if Smith had refused to obtain any engineering reports.

**14.** Contrary to appellants' assertion, this amount represents fees only and excludes costs and expenses.

charged in North Texas in these types of cases and that the fees were reasonable.

McQuality further testified that attorney's fees in this case could be calculated either in accordance with the hybrid contingency fee agreement that his firm entered into with the Honakers or in accordance with a "lode star" calculation. He testified that the Honakers paid his firm $41,000 in retainer fees, which consisted of an initial retainer and smaller monthly retainers for a certain number of months.[15] His firm would then receive a 33% contingency if the Honakers received any compensation before filing suit, 35% if they received any compensation after filing suit, and 40% if they recovered damages after the case went to trial. The $41,000 already paid by the Honakers would be credited to the attorney's fees recovery. McQuality testified that total contingent attorney's fees in this case would be $297,170.57. He then estimated that 80% of the total contingency fees—or $237,736.45—could be attributed to appellants. The amended final judgment awards the Honakers $237,736.45 in attorney's fees.

Appellants first contend that the evidence is insufficient to support an award of attorney's fees pursuant to the hybrid contingency fee agreement between the Honakers and their counsel.

In *Arthur Andersen*, the supreme court concluded that evidence of a contingency fee agreement alone cannot support an award of reasonable and necessary attorney's fees. *Id.* at 818; *VingCard A.S. v. Merrimac Hospitality Sys., Inc.*, 59 S.W.3d 847, 869 (Tex.App.-Fort Worth 2001, pet. denied) (op. on reh'g). While a contingency fee contract should be considered by the factfinder, the factfinder should also be guided by the other factors from rule 1.04(b). *Arthur Andersen*, 945 S.W.2d at 818; *VingCard*, 59 S.W.3d at 869. A party cannot simply ask to be awarded a percentage of the recovery as a fee because without evidence of the factors identified in rule 1.04(b), the factfinder has no meaningful way to determine if the fees were in fact reasonable and necessary. *Arthur Andersen*, 945 S.W.2d at 818–19; *VingCard*, 59 S.W.3d at 869. The court held that a party must prove that the amount of fees was both reasonably incurred and necessary to the prosecution of the case, and must ask for a specific dollar amount, not a percentage of the judgment. *Arthur Andersen*, 945 S.W.2d at 819; *VingCard*, 59 S.W.3d at 869.

Here, McQuality testified as to the *Arthur Andersen* factors. He also testified that the percentages charged in the hybrid contingency fee agreement "are usual and customary percentages charged on those types of cases." McQuality further stated that "given the fact that [his firm had] expended a considerable amount of time as reflected by Exhibit 25 that has not been compensated, that that is a reasonable and necessary fee in this case." He asked for a definite amount of 80% of $297,170.57. We hold that the evidence is legally and factually sufficient to show that the Honakers' attorney's fees of $237,736.45 were reasonable and necessary.

Appellants next complain that the trial court erred by awarding attorney's fees because the Honakers failed to allocate the amount of attorney's fees incurred with respect to each of the ten original defendants.

---

**15.** The documents in Exhibit 25 show that the initial retainer was $5,000, and the subsequent monthly retainers were $2,000 per month thereafter. They also show that the Honakers were responsible for paying all costs and expenses as they were incurred.

When a plaintiff seeks to recover attorney's fees in cases where there are multiple defendants, and one or more of those defendants have made settlements, the plaintiff must segregate the fees owed by the remaining defendants from those owed by the settling defendants so that the remaining defendants are not charged fees for which they are not responsible.

*Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 10–11 (Tex.1991); *Hartmann v. Solbrig,* 12 S.W.3d 587, 594 (Tex.App.-San Antonio 2000, pet. denied). Segregation is not required, however, if the claims arise out of the same transaction and are so interrelated that their prosecution or defense requires proof or denial of essentially the same facts. *Sterling,* 822 S.W.2d at 11; *Hartmann,* 12 S.W.3d at 594.

When McQuality was asked if he could apportion his fees among the defendants, he said,

> Yes, I have.... My experience has been that—these facts are typically so intertwined that it is very difficult to apportion fees to one defendant versus another. But I have attempted to do that and have calculated and looked at doing that. And I believe that—because there is a lot of duplication of work, whether it is one defendant or multiple defendants, I believe that at least 80 to 85 plus percent of the work would be the same whether or not it was just your clients or whether there were these other defendants as well.

He said he didn't keep track of the time he spent deposing each particular defendant, but that but for the efforts of the other defendants' attorneys, appellants' defense counsel would have had to ask more questions and spend more deposition time than he did. When asked if he kept track of how much time was spent on each defendant as to the total case, he answered

> I don't think there was any way to, and I don't think the case law requires us to keep a clock of hours spent as to each defendant because of the intertwining of the work. I have testified as far as my experience and thoughts on this case as far as the time spent totally, and that would be determined against your client as opposed to the others.

McQuality also said that in settling with the other defendants, he looked at the amount of attorney's fees in the case and considered that.

Although appellants construe McQuality's testimony as "vaguely insinuating" that the claims against all the defendants were so interrelated that their prosecution or defense requires proof or denial of essentially the same facts, McQuality unequivocally testified that there was a lot of duplication of work and that 80 to 85% of the work would be the same no matter what defendants remained in the suit. Appellants did not present any controverting evidence. Thus, we conclude that the evidence is legally and factually sufficient to support the award of attorney's fees in the amount of 80% of the total contingency fee amount proved by the Honakers.

■ Appellants further contend that there is no evidence to support the trial court's award of attorney's fees in the event of an appeal. But the Honakers included a request for such fees in their petition, and the trial court may take judicial notice of such reasonable and necessary fees even if its judgment does not state that it did so. *See Lefton v. Griffith,* 136 S.W.3d 271, 279 (Tex.App.-San Antonio 2004, no pet.); *Copeland v. Alsobrook,* 3 S.W.3d 598, 609 (Tex.App.-San Antonio 1999, pet. denied).

Lastly, appellants claim that the fees should be segregated between Smith and Main Place. But as we have stated above,

the evidence supports the conclusion that the claims against all the defendants, including appellants, were so interrelated that their prosecution or defense requires proof or denial of essentially the same facts. In addition, the Honakers point out that in his answer to their second amended petition, Smith asserted that he did not act in his individual capacity, but rather as an employee of Main Place. Thus, the evidence supporting DTPA liability as to Main Place also supports DTPA liability as to Smith and involves the same proof. *See Miller v. Keyser*, 90 S.W.3d 712, 716 (Tex. 2002).

We overrule appellants' third issue.

**DTPA violations**

■ In their fourth issue, appellants contend that the evidence is legally and factually insufficient to support the trial court's findings that appellants violated the DTPA. Specifically, appellants contend that the evidence is insufficient to support a violation of any of the "laundry list" violations set forth in subsections 5, 7, 12, 13, 20, and 24 of section 17.46 and that there is no evidence that appellants' conduct was a producing cause of the Honakers' damages. TEX. BUS. & COM.CODE ANN. §§ 17.46(b)(5), (7), (12), (13), (20), (24) (Vernon Supp.2005). As we have already addressed above in our disposition of appellants' second issue, there is legally and factually sufficient evidence to support the trial court's finding that appellants' conduct was a producing cause of the Honakers' damages. Thus, we need only address here whether there is sufficient evidence to show that appellants' conduct violated at least one of the "laundry list" violations found by the trial court.

The DTPA prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." *Id.* §§ 17.46(a), (b)(5), (7), (13), (22), (24), 17.50(a)(1); *Everett v. TK–Taito, L.L.C.,*

178 S.W.3d 844, 857 (Tex.App.-Fort Worth 2005, no pet.). To recover under the DTPA, the plaintiff must show that (1) he or she is a consumer, (2) the defendant engaged in a false, misleading, or deceptive act, and (3) the act constituted a producing cause of economic damages or damages for mental anguish. *See* TEX. BUS. & COM.CODE ANN. § 17.50(a)(1); *Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 478 (Tex.1995).

Section 17.46(b) sets forth a list of ways in which one can engage in false or misleading practices. Here, the trial court found that appellants violated the following subsections of section 17.46(b):

(5) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he does not;

. . . .

(7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

. . . .

(12) representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;

. . . .

(13) knowingly making false or misleading statements of fact concerning the need for parts, replacement, or repair service;

. . . .

(20) representing that a guarantee or warranty confers or involves rights or remedies which it does not have or involve . . . ; [and]

. . . .

(24) failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.

TEX. BUS. & COM.CODE ANN. §§ 17.46(b)(5), (7), (12), (13), (20), (24).

Appellants contend that the evidence is insufficient to support a violation of subsections 5, 7, 12, and 20 because Smith's statements to the Honakers—that "that shouldn't be a problem [the house falling off the hill] ... [t]his house and lot [are] as solid as they come," that the Honakers "would not have any problems with the house or the property falling away," and that he "built solid homes on solid lots"— were merely statements of opinion and not misrepresentations of fact. They further contend that the evidence is insufficient to support a violation of subsections 13 and 24 because those subsections require that the misrepresentation be intentional and knowing, and the evidence shows that appellants "had no intent to misrepresent the stability of the lot or home nor [had] any knowledge that any alleged misrepresentation concerning same was untrue."

With respect to subsections 5, 7, 12, and 20, appellants contend that Smith's statements to the Honakers were merely opinion rather than misrepresentations of fact because Richard testified that he did not think that Smith knew whether his promises about the land were true or false and that "[h]e was just giving me an opinion that he thought it would be okay." They also claim that the Honakers failed to prove that they relied on any false, misleading, or deceptive act or practice to their detriment because the evidence shows that (1) Smith is not an engineer, (2) he provided the Honakers with two engineering reports and agreed to a seven-day free-look period under the contract so that the Honakers could obtain satisfactory engineering reports, (3) the "defect" was not known to anyone until more than seven months after the slope failure and one and one half years after the Honakers purchased the home and nothing in the evidence indicates appellants should have known of the defect before then.

■ Misrepresentations are actionable under the DTPA "so long as they are of a material fact and not merely 'puffing' or opinion." *Pennington v. Singleton,* 606 S.W.2d 682, 687 (Tex.1980); *Kessler,* 953 S.W.2d at 519. In *Kessler v. Fanning,* this court held that three factors must be considered in determining whether a statement is an opinion or actionable misrepresentation: the specificity versus the vagueness of the statement, the comparative knowledge of the buyer and seller, and whether the representation relates to a past or current event or condition versus a future event or condition. 953 S.W.2d at 520. In that case, statements of the seller in the property condition disclosure form that there was not any "improper drainage" and no "previous structural repair" were not mere opinions and therefore actionable under the DTPA. *Id.*

Here, Smith's statements affirmatively assert that the property and home are stable and able to support the home and fill dirt, which they were not. These statements are specific, and Smith, as the representative of the home builder, was in a better position to know about the condition of the property than the Honakers, both of whom are physicians. Although this was Smith's first million-dollar home, and although he testified that he relied solely on his engineers to interpret the reports given to him by the developer, Smith had been building homes for several years; thus, regardless of the extent of his knowl-

edge, it was comparably greater than the Honakers'. Furthermore, Smith's statements about the condition of the home and property apply equally to the present and future condition of the home and property. Regardless of Richard's characterization of Smith's statements, when reviewing them in light of relevant case law, it is clear that they are more than mere opinion. Moreover, we have previously discussed the evidence supporting the Honakers' reliance on Smith's statements in purchasing the property.

Because the evidence is sufficient to support the trial court's finding and conclusion that appellants violated at least one of the laundry list prohibitions in section 17.46(b), we need not address appellants' contentions as to the remaining violations. *See* Tex.R.App. P. 47.1; *Checker Bag Co. v. Washington*, 27 S.W.3d 625, 634 (Tex.App.-Waco 2000, pet. denied). We overrule appellants' fourth issue.

Moreover, having determined that the trial court's judgment can be sustained based on the Honakers' DTPA claims, we overrule appellants' first issue.

## Knowing violation of DTPA

■■■ In their fifth issue, appellants contend that the evidence is legally and factually insufficient to support a finding that appellants' knowingly committed one of the "laundry list" violations.

■■■ A finding that the defendant acted knowingly is a prerequisite to an award for mental anguish[16] under the DTPA. Tex. Bus. & Com.Code Ann. § 17.50(b)(1); *Valley Nissan, Inc. v. Davila*, 133 S.W.3d 702, 715 (Tex.App.-Corpus Christi 2003, no pet.).[17] To prove that misrepresentations were made "knowingly," for DTPA purposes, a party must show that the misrepresentations were made with

> actual awareness, at the time of the act or practice complained of, of the falsity, deception, or unfairness of the act or practice giving rise to the consumer's claim or, in an action brought under Subdivision (2) of Subsection (a) of Section 17.50 [breach of express or implied warranty], actual awareness of the act, practice, condition, defect, or failure constituting the breach of warranty, but actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness.

Tex. Bus. & Com.Code Ann. § 17.45(9) (Vernon 2002). The supreme court has explained "actual awareness" as follows:

> "Actual awareness" does not mean merely that a person knows what he is doing; rather, it means that a person knows that what he is doing is false, deceptive, or unfair. In other words, a person must think to himself at some point, "Yes, I know this is false, decep-

16. The trier of fact may also award up to three times the amount of economic damages if it finds a violation was committed knowingly. Tex. Bus. & Com.Code Ann. § 17.50(b)(1). The trial court's findings and conclusions show that it did not award any additional damages other than mental anguish damages.

17. The only relief appellants request in connection with this issue is that this court render judgment in their favor or set aside the trial court's findings that appellants acted knowingly and remand for a new trial. They do not ask this court to reverse the trial

court's award of mental anguish damages in connection with their issue. A finding that a party "knowingly" violated the DTPA is immaterial if no damages were awarded as a result of that finding. *Checker Bag Co.*, 27 S.W.3d at 637. Presumably, the same logic would apply if the party does not challenge the damages awarded as a result of the "knowing" finding (i.e., here, the award of mental anguish damages). However, out of an abundance of caution, we will address appellants' issue.

tive, or unfair to him, but I'm going to do it anyway."

*St. Paul Surplus Lines Ins. Co. v. Dal-Worth Tank Co.,* 974 S.W.2d 51, 53–54 (Tex.1998). Direct evidence is not required to show that a misrepresentation was made "knowingly." *Gomez v. Diaz,* 57 S.W.3d 573, 579 (Tex.App.-Corpus Christi 2001, no pet.).

Both Richard and Ginger testified at trial that they did not believe Smith made any statements to them that he did not believe to be true when he made them. Richard testified, "I think he believed the land would be okay" and that Smith "had no knowledge whether [his] statements were false or true." Although Richard later agreed that he thought Smith knowingly misrepresented the investigation he had done regarding the stability of the lot and slope, he never testified to any specific misrepresentations regarding the extent of the investigation into the stability of the lot.

Smith testified that the first time he saw the lot, it had already been filled, and the retaining walls were already in place. He never inspected the fill dirt personally, but he relied on the two reports (the Rone report and additional borings report) that he obtained from the developer. Smith said that he did not think he needed to do any further investigation because Parrent told him he didn't need to do any additional investigation. Smith said that he and Parrent relied entirely on the two reports from the developer. Smith did not verify

that any of the recommendations in the Rone report had been done; he did not understand the report and just gave it to Parrent, his engineer.

The Honakers contend that appellants' receipt of the Rone report and additional borings report confers knowledge of the property condition on appellants; in effect, their argument is that by virtue of appellants' receipt of those reports, they should have known that the statements to the Honakers were false or misleading.[18] But although Whitney Smith, the engineer who testified for the Honakers, testified that the Rone report raised concerns about the stability of the property, he specifically agreed that the report would "raise a red flag" for "[m]ost *engineers* familiar with the formations" upon which the property was built. [Emphasis added.] There is no evidence that anyone other than an engineer would have been alerted to the stability problems simply by reading both reports. We conclude that there is no evidence to support the trial court's finding that appellants' "knowingly" violated the DTPA. Thus, we sustain appellants' fifth issue as to the second half of finding of fact 5.3 and as to conclusion of law 19.5.[19]

### Propriety of Turnover Order

In their sixth issue, appellants contend that the trial court abused its discretion by ordering that appellants turn over "[t]he insurance policy, declarations, and all documents related [to] Great American

---

18. The Honakers claim that the trial court "could well have concluded that the failure of [appellants] to assert claims against their architect and engineer, claims only they could have brought, would have brought evidence to the fore which would have confirmed this fact." But this supposition is mere speculation and not a reasonable inference from the facts sufficient to support a finding that appellants' conduct was knowing.

19. In finding of fact 5.3, the trial court found that "[a] reasonably prudent builder knows or should know that the unique geology of the Lot would make it highly unstable and that construction on the Lot would require a high degree of care to prevent soil movement and slope failure." In conclusion of law 19.5, the trial court concluded that appellants "knowingly misrepresented and failed to disclose certain conditions of the Home."

Lloyds policy PAC–982–01–64–01" and "[a]ll insurance claims or causes of action of [appellants] pursuant to [that] policy." Appellants contend that the trial court was not authorized to order such a turnover in the absence of a motion by the Honakers, that there is no evidence to support the turnover order, and that the turnover orders are premature.

Section 31.002 of the civil practice and remedies code provides a method for court-ordered collection of judgments, authorizing the trial court, among other things, to order the debtor to turn over nonexempt property that cannot readily be attached or levied on by ordinary legal process. TEX. CIV. PRAC. & REM.CODE ANN. § 31.002(a), (f) (Vernon Supp.2005). We review a turnover order for an abuse of discretion. *Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex.1991); *Roosth v. Roosth*, 889 S.W.2d 445, 458 (Tex.App.-Houston [14th Dist.] 1994, writ denied). In the context of turnover orders, a trial court's decision will not be overturned, even when it is based on an erroneous conclusion of law, if the judgment is sustainable for any reason. *Buller*, 806 S.W.2d at 226. Whether there is sufficient evidence to support the turnover order is a relevant consideration in determining whether the trial court abused its discretion. *Id.*

Appellants claim that the Honakers had the burden to prove that the insurance policy and potential bad faith claims were subject to the turnover statute. The turnover statute applies to property within the judgment debtor's possession or subject to his control. TEX. CIV. PRAC. & REM.CODE ANN. § 31.002(b)(1); *Ross v. Nat'l Ctr. For Employment of the Disabled*, 170 S.W.3d 635, 638 (Tex.App.-El Paso 2005, pet. filed). Once assets are traced to the judgment debtor, a presumption arises that those assets are in his possession, and the burden then shifts to him to account for the assets. *Buller*, 806 S.W.2d at 226; *Ross*, 170 S.W.3d at 638–39.

The Honakers contend that appellants' due process arguments—that they were deprived of notice and a hearing on this matter—fail because the insurance policy and potential bad faith claims are not corporeal assets, but choses in action, and thus, they are intangible. *See Day v. Day*, 896 S.W.2d 373, 376 (Tex.App.-Amarillo 1995, no writ). But a cause of action is property to which the turnover statute applies. *Charles v. Tamez*, 878 S.W.2d 201, 205 (Tex.App.-Corpus Christi 1994, writ denied); *Criswell v. Ginsberg & Foreman*, 843 S.W.2d 304, 306 (Tex.App.-Dallas 1992, no writ).

In addition, the Honakers, citing *Universe Life Ins. Co. v. Giles*, 982 S.W.2d 488, 492–93 (Tex.App.-Texarkana 1998, pet. denied), argue that even if the trial court abused its discretion in ordering the turnover, the error is not reversible because appellants' insurance company has not posted a supersedeas bond, has not alleged that it was harmed, and the trial court's order involves a benefit to appellants (because the potential bad faith claims would actually be brought for appellants' benefit). However, we have found no authority requiring a third party who is not alleged to be in possession of property to post a supersedeas bond to prevent the turnover of that property.

Section 31.002(d) provides that "[t]he judgment creditor *may move for the court's assistance under this section* in the same proceeding in which the judgment is rendered or in an independent proceeding." TEX. CIV. PRAC. & REM.CODE ANN. § 31.002(d) (emphasis added). The purpose of the turnover statute is to aid a diligent judgment creditor to reach certain

types of property of a judgment debtor. *Criswell,* 843 S.W.2d at 306. There is nothing in the record indicating that the Honakers ever requested that the trial court aid them in collecting the judgment by ordering appellants to turn over this property.

■■■■ The turnover statute is purely procedural; its purpose is to ascertain whether an asset is either in the judgment debtor's possession or subject to its control. *Republic Ins. Co. v. Millard,* 825 S.W.2d 780, 783 (Tex.App.-Houston [14th Dist.] 1992, orig. proceeding). The statute itself does not require notice and a hearing. *See* Tex. Civ. Prac. & Rem.Code Ann. § 31.002; *Sivley v. Sivley,* 972 S.W.2d 850, 861 (Tex.App.-Tyler 1998, no pet.). However, a factual showing that the judgment debtor has nonexempt property that is not readily subject to ordinary execution is of particular importance in applying section 31.002. *Clayton v. Wisener,* 169 S.W.3d 682, 684 (Tex.App.-Tyler 2005, no pet.); *see Schultz v. Fifth Judicial Dist. Court of Appeals at Dallas,* 810 S.W.2d 738, 740 (Tex.1991) (orig.proceeding), *abrogated on other grounds by In re Sheshtawy,* 154 S.W.3d 114 (Tex.2004). Section 31.002 authorizes a turnover order only upon proof of the necessary facts. *See Schultz,* 810 S.W.2d at 740; *Clayton,* 169 S.W.3d at 684.

■■■■ Here, there is no evidence in the record of any of the necessary facts. Appellants do not contend on appeal that they do not own the property, that it is not readily subject to execution, or that it is exempt. But they do not admit it either, and they do specifically challenge the sufficiency of the evidence to support these findings. We conclude that the trial court abused its discretion by ordering appellants to turn over "[t]he insurance policy, declarations, and all documents related [to] Great American Lloyds policy PAC–982–01–64–01" and "[a]ll insurance claims or causes of action of [appellants] pursuant to [that] policy." Therefore, we sustain appellant's sixth issue.

### Prejudgment Interest

■■■■ In their seventh issue, appellants contend that the trial court erred by awarding prejudgment interest on damages representing future repair costs to the home. The trial court's judgment provides, in pertinent part, as follows: "**THE COURT HEREBY ORDERS** that [the Honakers] recover from [appellants] past and future cost of repairs in the sum of $221,585.06 [and other listed damages].... The court further orders prejudgment interest at the annual rate of 5.0% *on that sum....* " [Emphasis added.] In its findings of fact, the trial court segregated these damages and found that the Honakers were entitled to past repair costs of $152,302.06 and future repair costs of $69,283.

Prejudgment interest is not recoverable on an award of future damages. Tex. Fin. Code Ann. § 304.1045 (Vernon Supp.2005). The Honakers concede that the trial court erred in awarding prejudgment interest with respect to future costs of repair. However, the parties dispute appellants' remedy for this error. The Honakers contend that we may modify the judgment to exclude the award of prejudgment interest as to the future costs of repair. *See* Tex. R.App. P. 43.2(b). Appellants contend we must reverse the entire award of prejudgment interest and render a take-nothing judgment on the Honakers' request for prejudgment interest because the Honakers did not segregate their past and future damages. *See Cresthaven Nursing Residence v. Freeman,* 134 S.W.3d 214, 223 (Tex.App.-Amarillo 2003, no pet.). Appellants do not challenge the amount of future costs of repair awarded to the Honakers.

In *Cresthaven*—which cites *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549 (Tex.1985), *abrogated in part on other grounds by Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507 (Tex.1998)—the plaintiff failed to segregate past and future damages in its jury charge. *Id.* at 222–23. The same situation occurred in *Cavnar*, 696 S.W.2d at 556. But the instant case was a bench trial, and the trial court's findings show that the Honakers did segregate their past and future costs of repair. Thus, penalizing the Honakers by deleting the entire award of prejudgment interest would not comport with the reasoning of *Cavnar* or *Cresthaven*. We hold that the correct disposition in this case is to modify the judgment to exclude $69,283—the amount the trial court found to be attributable to future costs of repair—from those damages upon which prejudgment interest is awarded. We sustain appellants' seventh issue.

### Mental Anguish Damages

■ Appellants complain about the general award of $50,000 in mental anguish damages to the Honakers; appellants contend that the trial court should have stated how much of the $50,000 was payable to Ginger and how much was payable to Richard. As the Honakers note in their brief, appellants do not contend that the award of mental anguish damages is improper, but they do contend that the trial court failed to delineate how the $50,000 should be divided between the Honakers.

Appellants cite *Wingate v. Hajdik*, 795 S.W.2d 717 (Tex.1990), for the proposition that a trial court errs when it renders a judgment for one plaintiff that includes damages that only another party is entitled to recover. But in *Wingate*, the trial court's judgment for the plaintiff included damages for a cause of action available only to the corporation of which the plaintiff was a stockholder. *Id.* at 719. Here, the Honakers, a married couple, joined in their pleadings and brought the same causes of action against appellants on which they were both entitled to recover.

Appellants contend that the damages should have been segregated because they are the separate property of each spouse. *See* Tex. Fam.Code Ann. § 3.001(3) (Vernon 1998); *Pratho v. Zapata*, 157 S.W.3d 832, 852 (Tex.App.-Fort Worth 2005, no pet.) (Walker, J., concurring). But appellants fail to articulate why this characterization of the property affects them rather than the Honakers. The Honakers, who appear to be the ones affected by the characterization of their marital property, have not challenged the lack of segregation of the mental anguish damages award in the judgment.

Each of the Honakers testified that they experienced physical symptoms as a result of their mental anguish over the problems with the property. Ginger testified that she suffered migraine headaches and that her relationship with Richard had suffered. Richard testified that he was severely depressed and had to take medication, that he and Ginger fought more often and weren't able to relax and enjoy their home as the haven they had hoped it would be. He also testified that he experienced sleeplessness, flattened affect, and changes in his appetite. This evidence is sufficient to support the Honakers' claim for mental anguish damages. *See Parkway Co. v. Woodruff*, 901 S.W.2d 434, 443 (Tex.1995).

Neither of the Honakers complains that the damages were not segregated between them. Appellants have not demonstrated how they—rather than the Honakers—were harmed by the trial court's failure to segregate those damages. *See* Tex.R.App. P. 44.1(a). We overrule appellants' eighth issue.

## Out–of–Pocket Expenses and Court Costs

■ In their ninth and tenth issues, appellants contend that the evidence is legally and factually insufficient to support the trial court's award to the Honakers of out-of-pocket expenses in the amount of $5,229.23 and court costs of $3,736.65. The Honakers concede that the award of out-of-pocket expenses is not supported by evidence and should be deleted. Thus, we sustain appellants' ninth issue. The Honakers also concede that the evidence supports an award of court costs in the amount of $2,676.65 rather than $3,736.65. Appellants contend that the Honakers are not entitled to court costs because those costs were subsumed within the attorney's fees award, but they also agree that if the Honakers are entitled to recover their costs, then those costs should be modified to reflect an award of $2,676.65. *See Wright v. Pino*, 163 S.W.3d 259, 262 (Tex. App.-Fort Worth 2005, no pet.).

■ Appellants contend that the award of court costs to the Honakers violates the "one satisfaction rule," which provides that a plaintiff may recover only for the damages suffered as a result of a particular injury. *Utts v. Short*, 81 S.W.3d 822, 833 (Tex.2002); *Foley v. Parlier*, 68 S.W.3d 870, 882 (Tex.App.-Fort Worth 2002, no pet.). A party may not obtain a double recovery for the same injury. *Waite Hill Servs., Inc. v. World Class Metal Works, Inc.*, 959 S.W.2d 182, 184 (Tex.1998). Appellants claim that the court costs were included within the $176,692.40 testified to by McQuality and, thus, were also pre-

sumptively included in any recovery based on the contingency fee agreement.

A review of the first page of Exhibit 25, the attorney's fees and expenses summary, shows that the $176,692.40 is the total amount for attorney's fees only. Expenses were not included within that amount. In addition, the invoices included in Exhibit 25 show that according to the hybrid contingency fee agreement, the Honakers paid all costs and expenses outright. McQuality testified that only $41,000 of what the Honakers had already paid would be deducted from any attorney's fees recovery under the contingency fee agreement. A review of Exhibit 25 shows that this amount represents only the initial retainer payments—$5,000 up front and $2,000 per month thereafter—representing an advance on attorney's fees. McQuality did not testify that the Honakers would receive any deduction for the costs and expenses they paid. Thus, we conclude that the award of court costs to the Honakers does not result in a double recovery and does not violate the one satisfaction rule. We sustain appellants' tenth issue to the extent it contends the amount of court costs awarded was excessive.

## Conclusion

Having sustained appellants' sixth, seventh, ninth, and tenth issues [20] we modify the judgment to (1) delete the provisions requiring appellants to turn over "[t]he insurance policy, declarations, and all documents related [to] Great American Lloyds policy PAC–982–01–64–01" and "[a]ll insurance claims or causes of action of [appellants] pursuant to [that] policy,"

**20.** Although we sustained appellants' fifth issue as to the second half of finding of fact 5.3 and conclusion of law 19.5, this finding and conclusion are not incorporated into the judgment. In addition, appellants did not challenge the trial court's mental anguish award on the ground that there was no evidence to

support the trial court's knowing finding and conclusion. Thus, we need not modify the judgment in any way as a result of sustaining appellants' fifth issue. *See Pat Baker Co. v. Wilson*, 971 S.W.2d 447, 450 (Tex.1998) (holding that trial court cannot reverse judgment based on unassigned error).

(2) delete the award of out-of-pocket costs, (3) delete the award of court costs of $3,736.65 and award costs to the Honakers in the amount of $2,676.76, and (4) to delete the award of prejudgment interest on $69,283, which represents future costs of repair.[21] Having overruled the remainder of appellants' issues, we affirm the judgment as modified.

---

**21.** Thus, prejudgment interest shall be calculated on $152,302.06 (past cost of repairs), $300,000 (permanent reduction in market value), $12,533.05 (special damages), and $50,000 (mental anguish damages), less the $30,000 settlement credits.