COURT OF APPEALS

                                       SECOND DISTRICT OF TEXAS

                                                   FORT WORTH

 

 

                                        NO. 2-09-248-CV

 

 

GLENDA AND LARRY RICE                                                  APPELLANTS

 

                                                   V.

 

METROPOLITAN
LIFE                                                             APPELLEE

INSURANCE
COMPANY                                                                        

 

                                              ------------

 

            FROM THE 67TH
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

In this life insurance dispute, appellants Glenda
and Larry Rice raise ten points to appeal the trial court=s order granting the traditional and no-evidence
summary judgment motion of appellee Metropolitan Life Insurance Company
(MetLife).  We affirm in part and reverse
and remand in part.   








Background

 

Underlying
facts   

Glenda purchased group universal life (GUL)
insurance for herself and a life insurance rider for her husband Larry, as her
dependant, from MetLife through a plan offered by her employer, Avon Products,
Inc.  Larry=s rider provided $50,000 in coverage.  Glenda retired from Avon in March 2003.

MetLife sent a letter dated May 10, 2003 that was
addressed to Glenda and described her insurance options upon retirement.  The letter contained information in its upper
right corner, under the title of ACoverage Information as of 5/10/2003,A about the amount of Glenda=s own coverage and of Larry=s coverage (described specifically in the letter
at $50,000).  It then stated in part,

You=ve worked for many years to ensure a solid financial future.  Now it=s time to
relax and let us keep a promise that we made to you when you enrolled for Group
Universal Life insurance. You trusted MetLife to provide a flexible life
insurance benefit that would meet a lifetime of protection needs.  Now, at this very important stage of your
life, we=d like to continue to offer you a menu of coverage options.  Most likely, your coverage needs have changed
since you first enrolled for GUL.  The
enclosed brochure and options sheet explains the options now available to you.

 

Please review
these options carefully.  Please note
that your current coverage will remain effective while you assess your choices
. . . .  To choose an option, simply
complete the attached election form, sign where indicated, and return to
MetLife in the envelope provided. . . .

 








We look
forward to continuing to serve your needs and help you keep your promises.  Again, congratulations and our best wishes
during your retirement!

 

The election form explained Glenda=s coverage options:  (1) ACONTINUE MY GUL COVERAGE,@ (2) AELECT A PAID-UP BENEFIT,@ (3) AELECT A METLIFE ANNUITY,@ or (4) ASURRENDER YOUR COVERAGE & RECEIVE YOUR CASH
FUND BALANCE.@  Glenda initially sent MetLife a fax in which
she chose the fourth option, but later on the same day that she sent the first
fax, after speaking with a MetLife employee named Summer, Glenda sent another
fax stating that she wanted to continue her coverage under the first option.
The second fax that Glenda sent stated in part, AI just discussed my decision to retain my
coverage with Summer, your customer service associate.  She has assured me my coverage will neither
lapse nor be cancelled.@








The certificate of insurance for Glenda=s group life insurance plan states that term life
insurance for dependants ends on the date of the employee=s retirement.[1]  However, for about two and a half years after
Glenda=s retirement, MetLife continued to bill and
accept quarterly premium payments for both Glenda=s coverage and Larry=s rider coverage. 
Glenda received a AGroup
Universal Life Report@
for the period of January to December 2005 that mentioned Larry=s $50,000 in coverage.[2]








In July 2005, MetLife discovered that it had
billed the Rices for Larry=s coverage since Glenda=s retirement in 2003, so in the latter part of
2005, MetLife stopped billing the Rices for that coverage without notice to
Glenda. When Glenda received the bill for the final quarter of 2005, she saw
for the first time that MetLife had stopped billing for Larry=s coverage. 
When she called MetLife in December 2005, MetLife=s employee, Angelica Ridge, explained to her that
MetLife did not cover term life insurance for dependants under the Avon group
policy upon an employee=s
retirement and that Larry=s
coverage had been canceled Aeffective July 2005.@[3]  Glenda
told Angelica that no one notified her of Larry=s coverage cancellation.  Despite this, according to Glenda, Angelica
told her that the premiums that Glenda had paid for Larry=s coverage would not be refunded and that Larry=s coverage was in place through July 2005. 

Procedural
history

The Rices filed claims against MetLife for bad
faith, breach of contract, violation of the Texas Deceptive Trade
Practices-Consumer Protection Act (DTPA),[4]
violation of chapter 541 of the insurance code,[5]
money had and received (based on the nonreturn of the Rices= premium payments for Larry=s coverage), promissory estoppel, breach of
fiduciary duty, and fraud by nondisclosure. 
MetLife filed, in one document, a traditional and no-evidence motion for
summary judgment on all of the Rices= claims. 
The court granted the motion in its entirety without specifying reasons
for doing so.  The Rices filed their
notice of this appeal.

The Trial
Court=s
Order Granting MetLife=s Summary Judgment Motion

In their first nine points, the Rices argue that
the trial court erred by granting MetLife=s traditional and no-evidence summary judgment
motion against their various claims.  








Standards
of review

Traditional summary judgment motions

A defendant who conclusively negates at least one
essential element of a cause of action is entitled to summary judgment on that
claim.  IHS Cedars Treatment Ctr. of
DeSoto, Tex., Inc. v. Mason, 143 S.W.3d 794, 798 (Tex. 2004).  Once the defendant produces sufficient
evidence to establish the right to summary judgment, the burden shifts to the
plaintiff to come forward with competent controverting evidence that raises a
fact issue.  Van v. Pena, 990
S.W.2d 751, 753 (Tex. 1999).

We review a summary judgment de novo.  Mann Frankfort Stein & Lipp Advisors,
Inc. v. Fielding, 289 S.W.3d 844, 848 (Tex. 2009).  We consider the evidence presented in the
light most favorable to the nonmovant, crediting evidence favorable to the
nonmovant if reasonable factfinders could and disregarding evidence contrary to
the nonmovant unless reasonable factfinders could not.  Id. 
We indulge every reasonable inference and resolve any doubts in the
nonmovant=s
favor.  20801, Inc. v. Parker, 249
S.W.3d 392, 399 (Tex. 2008).  We must
consider whether reasonable and fair-minded factfinders could differ in their
conclusions in light of all of the evidence presented.  See Wal-Mart Stores, Inc. v. Spates,
186 S.W.3d 566, 568 (Tex. 2006); City of Keller v. Wilson, 168 S.W.3d
802, 822B24 (Tex. 2005).








No-evidence summary judgment motions 

After an adequate time for discovery, the party
without the burden of proof may, without presenting evidence, move for summary
judgment on the ground that there is no evidence to support an essential
element of the nonmovant=s
claim or defense.  Tex. R. Civ. P.
166a(i).  The motion must specifically
state the elements for which there is no evidence.  Id.; Timpte Indus., Inc. v. Gish,
286 S.W.3d 306, 310 (Tex. 2009).  The
trial court must grant the motion unless the nonmovant produces summary
judgment evidence that raises a genuine issue of material fact.  See Tex. R. Civ. P. 166a(i); Hamilton
v. Wilson, 249 S.W.3d 425, 426 (Tex. 2008).








Like our review of traditional summary judgment
motions, when reviewing a no-evidence summary judgment, we examine the entire
record in the light most favorable to the nonmovant, indulging every reasonable
inference and resolving any doubts against the motion.  Sudan v. Sudan, 199 S.W.3d 291, 292
(Tex. 2006).  And also like traditional
motions, we review a no‑evidence summary judgment for evidence that would
enable reasonable and fair‑minded factfinders to differ in their
conclusions.  Hamilton, 249 S.W.3d
at 426 (citing City of Keller, 168 S.W.3d at 822).  We credit evidence favorable to the nonmovant
if reasonable factfinders could, and we disregard evidence contrary to the
nonmovant unless reasonable factfinders could not.  Timpte Indus., Inc., 286 S.W.3d at 310
(quoting Mack Trucks, Inc. v. Tamez, 206 S.W.3d 572, 582 (Tex.
2006)).  If the nonmovant brings forward
more than a scintilla of probative evidence that raises a genuine issue of
material fact, then a no-evidence summary judgment is not proper.  Smith v. O=Donnell,
288 S.W.3d 417, 424 (Tex. 2009).

Breach
of contract

In their third point, the Rices contend that the
trial court erred by granting summary judgment against their breach of contract
claim.  Insurance policies are
contracts.  Barnett v. Aetna Life Ins.
Co., 723 S.W.2d 663, 665 (Tex. 1987); see Markel Ins. Co. v. Muzyka,
293 S.W.3d 380, 385B86
(Tex. App.CFort
Worth 2009, no pet.) (describing various principles of contract interpretation
that apply to insurance policies).  AThe elements of a breach of contract claim are
(1) the existence of a valid contract, (2) performance or tendered performance
by the plaintiff, (3) breach of the contract by the defendant, and (4)
resulting damages to the plaintiff.@  Fieldtech Avionics & Instruments, Inc. v.
Component Control.Com, Inc., 262 S.W.3d 813, 825 (Tex. App.CFort Worth 2008, no pet.) (citing Harris v.
Am. Prot. Ins. Co., 158 S.W.3d 614, 622B23 (Tex. App.CFort Worth 2005, no pet.)).  








MetLife has not expressly argued that the
certificate of insurance does not qualify as a valid contract or that the Rices
did not perform under that contract. 
Rather, MetLife moved for summary judgment on the grounds that (1) there
was no evidence that it breached the contract because its termination of Larry=s coverage upon Glenda=s retirement was mandated by the terms of the
certificate of insurance and (2) the Rices have not suffered damages.

The Rices contend that MetLife waived its
termination of Larry=s
coverage under the certificate of insurance when it accepted premiums for two
and a half years and represented in writing after Glenda=s retirement that Larry had coverage.  Furthermore, they contend that the Acorrespondence and the associated oral and
written exchanges between MetLife and [Glenda] in May of 2003 is . . . an
extension of the original policy or a new contract implying the same terms.@  In
MetLife=s motion for summary judgment, it stated, AMistakenly, and to the benefit of Mr. Rice,
MetLife kept coverage in place and continued to charge group premiums for the dependent
coverage until July 2005 when the mistake was discovered.@ 








MetLife relies on Ulico Casualty Company v.
Allied Pilots Association to contend that coverage under the policy cannot
be expanded by the waiver or estoppel doctrines.  262 S.W.3d 773, 775B87 (Tex. 2008).[6]  In Ulico, the Texas Supreme Court
considered whether an insurer=s claims-made liability insurance policy
(requiring notification during the policy period to the insurer of a claim
against the insured) could be extended by those doctrines to cover a suit
against the insured by a third party that was filed within the policy period
but was not reported to the insurer until after the policy expired.  Id. at 775B77.  In
that case, although the insured had untimely reported the claim against it, the
insurer reviewed the claim and sent the insured a letter stating that the
insured=s defense costs would be paid.  Id. at 775B76.  Thus,
the insured pursued its defense, but when the insured=s counsel submitted a $635,000 bill for costs
incurred while defending the insured, the insurer sought a declaratory judgment
to determine that it did not owe the costs under the policy.  Id. at 776.  

At the trial of the insurer=s declaratory judgment case, the jury decided
that the insurer had agreed to pay the insured=s defense costs separately from the insurer=s original policy with the insured, had waived
its right to assert that the policy did not cover the costs, and was estopped
from asserting that the policy did not cover the costs.  Id. 
The trial court set aside the jury=s finding that the insurer agreed to pay the
costs apart from the policy but entered judgment as to the jury=s waiver and estoppel findings.  Id. 
We affirmed the trial court=s judgment. 
Id. at 776B77.









In reversing our decision, the supreme court
noted that when a policy covers risks for a certain time period (such as the
certificate of insurance does here by ending Larry=s term insurance on the date of the Glenda=s retirement), Athe time of the event allegedly triggering
coverage is a precondition to coverage and is not considered a defensive matter
to be pleaded and proved by the insurer. 
The insurer has neither a >right= nor a burden to assert noncoverage of a risk or
loss . . . .@[7]  Id.
at 778 (citation omitted).  Then, the
court explained that it had 








addressed the question of whether the contractual
coverage of an insurance policy can be expanded by waiver or estoppel over
seventy years ago in Washington National Insurance Co. v. Craddock, 130
Tex. 251, 109 S.W.2d 165 (Tex. 1937).  In
that case, Craddock, the insured, was entitled to weekly indemnity payments if
he became incapacitated from an accidental injury. The policy specifically
excepted gunshot wound injuries from coverage. 
Craddock accidentally shot himself with a pistol, submitted a claim, and
the insurer started paying weekly benefits. After making eleven payments, the
insurer stopped paying because the injury was not covered.  Craddock sued.  In his pleadings Craddock acknowledged that
the policy specifically excepted injuries from gunshot wounds from
coverage.  Craddock claimed that he told
the company=s agent and filed his claim showing he was injured by a gunshot, yet
the insurer paid weekly benefits. The issue and this Court=s answer were straightforward:

 

[B]ut he alleged further that the company having
paid him 11 weeks= indemnity for an accidental injury produced by a gunshot wound, had
waived this condition of the policy, and was therefore bound and obligated to
pay him the remaining 93 weekly installments, and was estopped from denying its
liability by virtue of such waiver.  He
alleged also that he had gone to considerable expense in securing and preparing
claims and proof of injury.

 

. . . The
question presented is not whether the act of the insurance company in making
payments would constitute a waiver of its right to forfeit the policy on
account of some breach by the insured of its terms, but is whether a
contractual liability may be created by a waiver.  By its policy the insurance company did
not assume any liability for the risk declared upon and no consideration moved
to it after the accident for the assumption of such liability. The insured
seeks to create that liability by invoking the doctrine of waiver.  The doctrine cannot be made to serve that
purpose.

 

Id. at 778B79 (some citations omitted).  








Thus, conforming to its Craddock decision,
the supreme court in Ulico held that waiver and estoppel cannot be used
to rewrite an insurance policy and expand coverage.  Id. at 781, 787; see also Metro
Allied Ins. Agency, Inc. v. Lin, 304 S.W.3d 830, 836 (Tex. 2009) (stating
that the Alaw
is clear that misrepresentations about insurance coverage cannot, under the
doctrine of estoppel, expand coverage provided in an insurance policy@); Tex. Farmers Ins. Co. v. McGuire, 744
S.W.2d 601, 603 (Tex. 1988) (op. on reh=g) (stating that waiver and estoppel Ahave consistently been denied operative force to
change, re‑write and enlarge the risks covered by a policy.@).  And in
harmony with Ulico, Texas courts had previously held that an insurer=s acceptance of premiums does not create coverage
through the waiver or estoppel doctrines. See, e.g., Great Am. Reserve Ins.
Co. v. Mitchell, 335 S.W.2d 707, 708 (Tex. Civ. App.CSan Antonio 1960, writ ref=d) (holding that when a life insurance policy
said that coverage terminated when an employee reached the age of sixty-five,
the insurer=s
acceptance of premiums after the insured reached that age did not create
coverage by waiver or estoppel).

Accordingly, under the binding precedent of Ulico,
we cannot agree with the Rices that MetLife=s acceptance of premiums or its other actions
create a fact question as to whether the termination-upon-retirement clause of
the certificate of insuranceCthe original contract between the partiesCwas negated or rewritten because of waiver or
estoppel.[8]








The Rices also argue that MetLife should be
liable for breach of the original insurance contract because it did not issue a
personal policy to Larry or give Larry an application for such a policy upon
the termination of his rider coverage in March 2003.  The portion of the certificate of insurance
relating to riders states that MetLife would Aissue a personal policy of life insurance
. . . to a Dependent if that Dependent applie[d] for it in writing
during@ the A31 day period after the date the Dependent Term
Insurance on that Dependent ends@ because of the employee=s retirement. 
Although the certificate of insurance does not expressly state that
MetLife must issue a personal policy apart from a timely application or even
that MetLife was required to inform the Rices about their ability to apply for
a personal policy, the Rices essentially contend that MetLife=s giving them a fair opportunity to convert Larry=s rider coverage into individual coverage is an
implied term of the certificate.  In a
related argument, they also assert that MetLife was required to provide notice
that Larry=s
rider coverage had been canceled because notice of cancellation was an implied
term of the certificate.








We must usually look only to the written contract
to determine the obligations of parties, and it is typically not proper for us
to imply terms that contradict a contract=s express language.  See Universal Health Servs., Inc. v.
Renaissance Women=s
Group, P.A., 121 S.W.3d
742, 747 (Tex. 2003). In other words, courts Acannot make contracts for [the] parties.@ HECI Exploration Co. v. Neel, 982 S.W.2d 881, 888 (Tex. 1998) (quoting
Gulf Prod. Co. v. Kishi, 129 Tex. 487, 493, 103 S.W.2d 965, 968
(1937)).  Thus,

A covenant will not be implied unless it appears from
the express terms of the contract that Ait was so
clearly within the contemplation of the parties that they deemed it unnecessary
to express it,@ and therefore they omitted to do so, or Ait must appear that it is necessary to infer such a covenant in order
to effectuate the full purpose of the contract as a whole as gathered from the
written instrument.@

 

Neel, 982 S.W.2d at 888 (emphasis added) (quoting Danciger
Oil & Ref. Co. v. Powell, 137 Tex. 484, 490, 154 S.W.2d 632, 635
(1941)); see Fielding, 289 S.W.3d at 850.  An implied covenant Amust rest entirely on the presumed intention of
the parties as gathered from the terms as actually expressed in the written
instrument itself.@  Universal Health Servs., Inc., 121
S.W.3d at 748 (emphasis added).








Under these standards, we cannot conclude that
MetLife=s giving the Rices notice of their opportunity to
gain individual coverage for Larry after Glenda=s retirement or sending them official notice of
the cancellation of Larry=s
original coverage are implied terms of the certificate of insurance.  As gathered from the written instrument
itselfCthe
certificate of insuranceCand
not from MetLife=s
actions, Larry=s
original coverage explicitly ended upon Glenda=s retirement, and the Rices therefore had to
apply for a personal policy for Larry within thirty-one days after her
retirement.[9]  Because the certificate of insurance
particularly described these conditions, we conclude that MetLife=s sending notice of the conditions after Glenda
retired was neither Aclearly
within the contemplation of the parties@ nor Anecessary . . . to effectuate the full purpose of
the contract.@
 See Neel, 982 S.W.2d at 888;
see also Hartland v. Progressive County Mut. Ins. Co., 290 S.W.3d 318,
324 (Tex. App.CHouston
[14th Dist.] 2009, no pet.) (AA notice of cancellation is not required when a
policy expires under its own terms.@).  While
it may seem reasonable to require such additional notice as an implied term of
the certificate of insurance under the circumstances of this case, A[i]t is not enough to say that an implied
covenant is necessary in order to make the contract fair.@  Neel,
982 S.W.2d at 889; see Universal Health Servs., Inc., 121 S.W.3d at
748.  








We also cannot agree with the Rices that MetLife=s providing an application form for a personal
insurance policy for Larry is an implied term of the original certificate of
insurance.  Although the Rices question
how they were supposed to apply for a personal policy without an Aapplication form@ that was provided by MetLife, the certificate of
insurance does not require any particular form; it places the burden on the
dependant to apply for a personal policy Ain writing@ during the application period.  The Rices have not cited any authority
holding that an insurance company has an implied contractual duty to supply an Aapplication form@ in a similar circumstance.

For all of these reasons, we overrule the Rices= third point to the extent that their breach of
contract claim rests on a breach of the original certificate of insurance; we
conclude that the Rices have not presented more than a scintilla of evidence to
support that claim.

On the other hand, we conclude that the evidence
creates a genuine fact question regarding whether MetLife breached a new,
separate agreement regarding Larry=s coverage. 
As we have explained,

Under Texas law, the requirements of a valid
contract are:  (1) an offer; (2) an
acceptance in strict compliance with the terms of the offer; (3) a meeting of
the minds; (4) each party=s consent to the terms; and (5) execution and delivery of the contract
with the intent that it be mutual and binding. 
Consideration is also a fundamental element of a valid contract.

 








Hubbard
v. Shankle, 138 S.W.3d 474, 481
(Tex. App.CFort
Worth 2004, pet. denied) (citation omitted); see Burges v. Mosley, 304
S.W.3d 623, 629 (Tex. App.CTyler 2010, no pet.) (AFor a contract to exist, there must be an offer,
acceptance, and consideration.@); Domingo v. Mitchell, 257 S.W.3d 34, 39
(Tex. App.CAmarillo
2008, pet. denied).  

To determine whether an offer and acceptance and
thus a Ameeting of the minds@ occurred, we use an objective standard, Aconsidering what the parties did and said, not
their subjective states of mind.@  Domingo,
257 S.W.3d at 39 (citing Komet v. Graves, 40 S.W.3d 596, 601 (Tex. App.CSan Antonio 2001, no pet.)); see Paciwest,
Inc. v. Warner Alan Props., LLC, 266 S.W.3d 559, 568 (Tex. App.CFort Worth 2008, pet. denied); Angelou v.
African Overseas Union, 33 S.W.3d 269, 278 (Tex. App.CHouston [14th Dist.] 2000, no pet.) (AUnexpressed subjective intent is irrelevant.@). @[V]aluable and sufficient consideration for a
contract may consist of either a benefit to the promisor or a loss or detriment
to the promisee.  Thus when a promisee
acts to his detriment in reliance upon a promise, there is sufficient consideration
to bind the promisor to his promise.@  Jennings
v. Radio Station KSCS, 708 S.W.2d 60, 61 (Tex. App.CFort Worth 1986, no writ); see Frequent Flyer
Depot, Inc. v. Am. Airlines, Inc., 281 S.W.3d 215, 224 (Tex. App.CFort Worth 2009, pet. denied), cert. denied,
130 S. Ct. 2061 (2010).








In Ulico, the supreme court upheld the
trial court=s
decision to disregard the jury=s determination that the parties had entered into
a separate agreement for the payment of the insured=s defense costs. 
Ulico, 262 S.W.3d at 789B90. The supreme court reasoned that there was no
consideration for such a separate agreement; the insured did not present any
evidence that the insurer received a benefit in exchange for continuing payment
of the costs or that the insured suffered a detriment by undertaking an
obligation, surrendering a legal right, changing whether it would have paid the
costs based on the insurer=s representation that it would pay them, or
otherwise acting in a different way because the insurer agreed to pay the
costs.  Id.  








Unlike in Ulico, the Rices suffered a
detriment because Glenda continued to pay premiums for Larry=s coverage for more than two years while relying
on MetLife=s
representations that he had coverage, and she averred in her affidavit that
because of AMetLife=s cancellation of the policy after 22 years and the state of [Larry=s] health,@ she was unable Ato now obtain coverage@ for him. Also, MetLife received the premiums and
kept them for several years although it eventually repaid them.[10]  Thus, reviewing the record in the light most
favorable to the Rices, we conclude that the evidence raises a genuine issue of
material fact about whether the Rices gave consideration for a new agreement
with MetLife regarding Larry=s coverage.








Similarly, we also hold that the evidence raises
a genuine issue of material fact on the remaining elements of the formation of
a new contract and on a breach of that contract.  The evidence, when viewed objectively rather
than subjectively (in other words, when looking at what the parties actually
said in their 2003 exchanges and disregarding MetLife=s 2005 contention that it was merely mistaken
when it represented that Larry maintained coverage), presents a genuine fact
issue on offer, acceptance, meeting of the minds, and delivery of the contract
with the intention that it be mutual and binding.  Particularly, the evidence shows the
following:  (1) in May 2003, MetLife sent
a letter to Glenda that gave her the option of continuing her coverage,[11]
(2) Glenda responded to the letter by informing MetLife that she wanted to
retain the coverage, (3) MetLife=s employee, Summer, told Glenda that the coverage
Awould neither lapse nor be cancelled,@ (4) Glenda paid premiums for her own coverage
and for Larry=s
coverage multiple times after May 2003, and (5) MetLife responded by
sending a report to Glenda that confirmed Larry=s coverage.

Also, the evidence creates a genuine fact issue
on a breach of the new, separate contract and resulting damages because MetLife
later stopped billing

for
Larry=s premiums and told Glenda that Larry did not
have coverage, and Glenda could not obtain other coverage for Larry after the
cancellation of the policy.  See El
Paso Prod. Co. v. Valence Operating Co., 112 S.W.3d 616, 621 (Tex. App.CHouston [1st Dist.] 2003, pet. denied) (op. on
reh=g) (explaining that a repudiation of a contract
comprises a breach of it); Bumb v. InterComp Techs., L.L.C., 64 S.W.3d
123, 125 (Tex. App.CHouston
[14th Dist.] 2001, no pet.) (same).








For these reasons, indulging every reasonable
inference in the Rices=
favor, we hold that the trial court erred by granting MetLife=s no-evidence summary judgment motion against the
Rices= breach of contract claim because there is more
than a scintilla of probative evidence to support the Rices= theory that MetLife breached a new agreement
regarding Larry=s
coverage.[12]
See Smith, 288 S.W.3d at 424; Sudan, 199 S.W.3d
at 292.  Thus, we sustain the Rices= third point to the extent that it rests on their
argument that MetLife breached a new contract for the coverage.

Duty
of good faith and fair dealing








In their second point, the Rices claim that the
trial court erred by granting summary judgment against their bad faith (breach
of the duty of good faith and fair dealing) claim.  Texas courts have long recognized a common
law duty of good faith and fair dealing in insurance relationships. Vandeventer
v. All Am. Life & Cas. Co., 101 S.W.3d 703, 722 (Tex. App.CFort Worth 2003, no pet.); see Arnold v. Nat=l County Mut. Fire Ins. Co., 725 S.W.2d 165, 167 (Tex. 1987).  An insurer breaches the duty of good faith
and fair dealing when it Awrongfully
cancels an insurance policy without a reasonable basis@ and the insurer Aknew or should have known of that fact.@ Union Bankers Ins. Co. v. Shelton, 889
S.W.2d 278, 283 (Tex. 1994) (explaining that the Ainsurer=s ability to unilaterally cancel an insurance
policy and the insured=s
inability to prevent cancellation demonstrates a great disparity in bargaining
power between the two parties@); see Columbia Universal Life Ins. Co. v.
Miles, 923 S.W.2d 803, 811 (Tex. App.CEl Paso 1996, writ denied); Hopkins v.
Highlands Ins. Co., 838 S.W.2d 819, 827 (Tex. App.CEl Paso 1992, no writ).

The Rices contend that MetLife is liable for bad
faith because it canceled Larry=s coverage retroactively in 2005 when there was
no reasonable basis for the cancellation and initially refused to refund
premiums.  We have held that the evidence
raises a genuine fact issue about whether the parties formed a contract in May
2003 that gave Larry new coverage. 
Accordingly, we conclude that there is more than a scintilla of evidence
that MetLife wrongfully canceled Larry=s new coverage without a reasonable basis and
knew or should have known of that fact. 
The evidence shows that MetLife told Glenda that her coverage would
neither lapse nor be canceled, continued to accept premiums for Larry=s coverage for over two years, confirmed to the
Rices after 2003 through a Group Universal Life Report that Larry still had
coverage, and then canceled the coverage while telling her that it was in place
through July 2005 (which is inconsistent with MetLife=s claim that the coverage expired in March 2003
upon Glenda=s
retirement and that Larry did not obtain new coverage through the parties= communications).

We conclude that a genuine issue of material fact
exists to preclude the trial court=s decision to grant summary judgment against the
Rices on their bad faith claim.  We
therefore sustain the Rices= second point.








Promissory
estoppel

  In their
fourth point, the Rices argue that the trial court erred by granting summary
judgment against their promissory estoppel claim.[13]  The Rices alleged in their petition that by Acontinuing to accept premium payments . . .,
[MetLife] promised [the Rices] that [MetLife] would continue to provide
insurance as long as the premiums were paid.@  They also
asserted that they relied on MetLife=s alleged promise by continuing to pay the
premiums and by not seeking alternate insurance for Larry.  MetLife moved for summary judgment against
the Rices=
promissory estoppel claim on the ground, among others, that it did not make any
promise that Larry=s
coverage would last forever.  The Rices
responded by directing the trial court to, among other documents, MetLife=s May 10, 2003 letter.








Although estoppel based on an insurer=s misrepresentations may not be used to expand
coverage contractually, an insurer=s actions can result in it being estopped from
refusing to Amake
its insured whole@
for Aany damages [the insured] sustains because of the
insurer=s actions.@  Ulico,
262 S.W.3d at 782, 787.  AIf a promisee has reasonably and detrimentally
relied on an otherwise unenforceable promise, he may have a cause of action for
promissory estoppel.@  MCN Energy Enters., Inc. v. Omagro de
Colombia, L.D.C., 98 S.W.3d 766, 774 (Tex. App.CFort Worth 2003, pet. denied); see In re
Weekley Homes, L.P., 180 S.W.3d 127, 133 (Tex. 2005) (orig. proceeding)
(explaining that when Aa
promisor induces substantial action or forbearance by another, promissory
estoppel prevents any denial of that promise if injustice can be avoided only
by enforcement@).  

AThe elements of promissory estoppel are: (1) a
promise,[[14]]
(2) foreseeability of reliance on the promise by the promisor, and (3)
substantial detrimental reliance by the promisee.@  Hubbard, 138 S.W.3d at 482; see MCN
Energy Enters., Inc., 98 S.W.3d at 774. 
Although promissory estoppel is normally a defensive theory, it may
serve as a substitute for an unsuccessful 
breach of contract claim.  See
Wheeler v. White, 398 S.W.2d 93, 97 (Tex. 1965); Medistar Corp. v.
Schmidt, 267 S.W.3d 150, 163 (Tex. App.CSan Antonio 2008, pets. denied).








We have held that the Rices= breach of contract claim, to the extent that it
rests on MetLife=s
breaching the certificate of insurance and does not rest on MetLife=s breaching a subsequent contract between the
parties, cannot succeed as a matter of law because despite MetLife=s actions, Larry=s coverage under the certificate of insurance was
not extended past Glenda=s
retirement. Because there was no contract for Larry=s original coverage under the certificate of
insurance past March 2003, promissory estoppel may apply to MetLife=s representation of that coverage if a factfinder
determines that the parties did not later enter into a new contract for the
coverage.  See Doctors Hosp. 1997,
L.P. v. Sambuca Houston, L.P., 154 S.W.3d 634, 636 (Tex. App.CHouston [14th Dist.] 2004, pet. abated) (stating
that ATexas courts have held that promissory estoppel
becomes available to a claimant only in the absence of a valid and
enforceable contract@);
Secure Comm, Inc. v. Anderson, 31 S.W.3d 428, 431 n.3 (Tex. App.CAustin 2000, no pet.) (A[P]romissory estoppel and breach of contract may
be mutually exclusive causes of action.@); see also Wheeler, 398 S.W.2d at 94, 97
(holding that a plaintiff could recover on a promissory estoppel theory when
pled as an alternative to breach of contract).

MetLife=s letter to Glenda represented under a heading of
ACoverage Information@ that as of May 10, 2003, the face amount of
Glenda=s ASpouse Term@ coverage was $50,000.  The letter notified Glenda, A[Y]our current coverage will remain effective
while you assess your choices,@ and it told her that MetLife wanted to Akeep a promise@ that it had made to her.








Glenda=s affidavit says that about three weeks after the
date of MetLife=s
letter, MetLife=s
employee, Summer, told Glenda that her coverage on the policy would neither
lapse nor be canceled.  It also explains
that Glenda Aregularly
received bills from MetLife entitled >Group Universal Life Payment Notice= and a >Group Universal Life Report= both stating the $50,000 coverage for [Larry]
was included.@  Glenda submitted the 2005 AGroup Universal Life Report@ as evidence; that report, under the heading of ABeginning Values 12/31/04,@ states, ASpouse Rider Face Amount:  50,000.00.A








We conclude that when viewed in the light most favorable
to the Rices, this evidence creates a genuine issue of material fact as to
whether MetLife made a promise to continue Larry=s coverage and whether it was foreseeable to
MetLife that the Rices would rely on that promise.  See Tex. R. Civ. P. 166a(c).  Although MetLife argues that the language
related to the four insurance options that were presented to Glenda in May 2005
on the election form concerns only Glenda=s coverage and does not explicitly mention Larry=s coverage, for the reasons stated above, we
conclude that a genuine fact issue exists as to whether MetLife represented
that both Glenda=s
and Larry=s
coverage would be extended if she chose the first option that was labeled ACONTINUE MY GUL COVERAGE.@[15]








MetLife argues that the Rices= promissory estoppel claim fails because Glenda
was deemed to know the terms contained in the certificate of insurance,
including the term that Larry=s coverage ended upon her retirement.  We have noted that a named insured is
presumed to have read its policy and to know the policy=s contents. 
Jenkins v. State & County Mut. Fire Ins. Co., 287 S.W.3d 891,
897 (Tex. App.CFort
Worth 2009, pet. denied). However, the Texas Supreme Court has held that this
presumption may be overcome by proof that the insured did not know the policy=s contents when it was accepted.  Colonial Sav. Ass=n v. Taylor, 544 S.W.2d 116, 119 (Tex. 1976) (quoting Fireman=s Fund Indem. Co. v. Boyle Gen. Tire Co., 392 S.W.2d 352, 355 (Tex.1965)); see Ins.
Network of Tex. v. Kloesel, 266 S.W.3d 456, 476 (Tex. App.CCorpus Christi 2008, pet. denied); Union Nat.
Bank of Little Rock v. Moriarty, 746 S.W.2d 249, 250B51 (Tex. App.CTexarkana 1987, writ denied) (explaining that an @insured is allowed to rely on the knowledge and
expertise of the insurer@).  

The evidence shows that the Rices paid premiums
for Larry=s
coverage for over two years after Glenda retired and that Angelica Ridge had to
explain to Glenda in 2005 that Larry no longer had coverage because Glenda
thought that a quarterly bill=s omission of a premium charge for his coverage Awas a mistake.@  Viewed in
the light most favorable to the Rices, this evidence creates a genuine fact
issue as to whether the Rices had knowledge of the term of the certificate of
insurance that caused Larry=s original coverage to expire. Therefore, we
cannot agree with MetLife that for summary judgment purposes, the Rices are
deemed to know the contents of their policy or that their promissory estoppel
claim must fail on that basis.








We also agree with the Rices= statement that under the circumstances in this
case, it would be unreasonable to charge them with knowing and following the
terms of the certificate of insurance when MetLife, which issued the
certificate, did not even follow its own terms for over two years by
continuously accepting quarterly premiums for Larry=s coverage after Glenda=s retirement. 
Finally, even if the Rices actually knew about the term of the
certificate that ended Larry=s coverage upon Glenda=s retirement or were charged with constructive
knowledge of that term, MetLife=s acts that occurred after her retirement gave
them a reason to believe that MetLife was either altering or not enforcing that
term and that Larry=s
coverage had been extended despite the term.[16]

For these reasons, we hold that, indulging all
inferences in the Rices=
favor, the trial court erred by granting MetLife=s summary judgment motion on the Rices= promissory estoppel claim.  We sustain the Rices= fourth point. 

DTPA

In their fifth point, the Rices argue that the
trial court erred by granting summary judgment against their DTPA claim.  In the trial court, MetLife moved for summary
judgment on that claim on the ground that there was no evidence of it.

False, misleading, or deceptive acts or practices








The DTPA creates a cause of action when a
consumer suffers from A[f]alse,
misleading, or deceptive acts or practices in the conduct of any trade or
commerce.@  Tex. Bus. & Com. Code Ann. ' 17.46(a). 
Such Aacts
or practices@
include Arepresenting that goods or services have
. . . characteristics . . . which they do not have@ and Arepresenting that an agreement confers or
involves rights, remedies, or obligations which it does not have or involve.@  Id.
' 17.46(b)(5), (12); see Commonwealth
Lloyds Ins. Co. v. Downs, 853 S.W.2d 104, 116 (Tex. App.CFort Worth 1993, writ denied).

To prevail on a DTPA claim, a plaintiff must
prove that the defendant=s
misrepresentation was the producing cause of the plaintiff=s injuries. 
Tex. Bus. & Com. Code Ann. ' 17.50(a); Alexander v. Turtur & Assocs.,
Inc., 146 S.W.3d 113, 117 (Tex. 2004); Main Place Custom Homes, Inc. v.
Honaker, 192 S.W.3d 604, 616 (Tex. App.CFort Worth 2006, pet. denied).  Producing cause requires that the defendant=s act be both a cause‑in‑fact and a Asubstantial factor@ in causing the injuries.  Honaker, 192 S.W.3d at 616.
The plaintiff must also prove that it relied on the defendant=s misrepresentation to its detriment.  Tex. Bus. & Com. Code Ann. ' 17.50(a)(1)(B).

The Rices contend that MetLife=s May 10, 2003 letter, Glenda=s phone conversation with Summer, and MetLife=s prolonged acceptance of premiums create a
genuine fact dispute about whether MetLife engaged in false, misleading, or
deceptive acts because it misrepresented that all of the terms of her original
insurance policy, including Larry=s coverage, would be continued if she elected to
do so.  We agree.








MetLife=s letter explicitly stated that as of May 2003,
Larry had $50,000 in coverage.  It then
told Glenda that the Acurrent
coverage would remain effective@ and appeared to give her the option to continue
that coverage by continuing to Apay the same rates as when [she was] an active
employee.@
We hold that under the relevant no-evidence summary judgment standards,
this evidence and the other evidence detailed above creates a fact issue about
whether MetLife misrepresented the continuation of Larry=s coverage, precluding summary judgment on that
part of the Rices=
DTPA claim.[17]
See Tex. R. Civ. P. 166a(i); Lennar Corp. v. Great Am. Ins.
Co., 200 S.W.3d 651, 700 (Tex. App.CHouston [14th Dist.] 2006, pets. denied) (op. on
reh=g) (relating that an insurer=s affirmative misrepresentation that creates an
insured=s mistaken belief about coverage may be
actionable under the DTPA); State Farm Fire & Cas. Co. v. Gros, 818
S.W.2d 908, 912B13
(Tex. App.CAustin
1991, no writ) (holding that an insurer was liable under the DTPA for
misrepresenting the terms of an insurance policy).








MetLife asserts, however, that if there was a
misrepresentation, it cannot be a producing cause of the Rices= injuries and the Rices could not have
detrimentally relied on it because (1) Larry had an opportunity to purchase a
personal policy form MetLife in December 2005 but failed to do so and (2) the
Rices= premiums for Larry=s coverage have been returned to them with
interest (after they filed their lawsuit).[18]  But even if we consider MetLife=s evidence to support its no-evidence summary
judgment motion,[19]
that evidence does not conclusively establish that MetLife gave Larry an
opportunity to purchase a personal policy in December 2005.  Angelica Ridge=s affidavit does not indicate that she expressly
told Glenda that she could purchase a personal policy for Larry.  And while the affidavit states that Angelica
told Glenda in December 2005 that she would Arequest a conversion notice@ based on Glenda=s Acancelled spouse rider@ and asserts that such a notice was mailed to
Glenda, Glenda=s
affidavit states that she never received any notice of the cancellation of
Larry=s coverage and that Angelica told her that an
agent would contact her about purchasing a personal policy but that she was
never contacted by an agent.








As to MetLife=s second argument, the Rices concede that MetLife
has returned money equal to the premiums that they paid for Larry=s coverage after Glenda=s retirement. 
However, we conclude that the evidence presented by the Rices still
creates a fact issue on detrimental reliance. 
Glenda=s
affidavit concludes by stating, ADue to MetLife=s cancellation of the policy after 22 years and the state of my husband[>]s health, it is not within my family=s financial means to now obtain coverage for my
husband.@  Indulging
every inference in the Rices= favor, we hold that this statement adequately
relates that the passage of time associated with MetLife=s allegedly wrongful acts (in which the Rices
thought that Larry had coverage when he did not) deprived the Rices of the
opportunity to obtain coverage elsewhere.  See Sudan, 199 S.W.3d at 292.  Thus, we hold that the statement comprises
more than a scintilla of evidence of the Rices= detrimental reliance on MetLife=s representation to Glenda even if, as MetLife
argues, the statement does not use the words Arely@ or Areliance@ but instead uses the word Acancellation.@ See Smith, 288 S.W.3d at 424. 

For these reasons, we conclude that the trial
court erred by granting MetLife=s summary judgment motion against the part of the
Rices= DTPA claim 
that alleges that MetLife engaged in false, misleading, or deceptive
acts or practices, and we sustain the Rices= fifth point to that extent.      








Unconscionability

Next, the Rices assert that the trial court erred
by granting MetLife=s
summary judgment motion against their DTPA unconscionability claim.
To maintain a claim for unconscionability under the DTPA, a plaintiff must
prove that it suffered from an act or practice that, to the plaintiff=s detriment, took advantage of its lack of
knowledge, ability, experience, or capacity to a grossly unfair degree.  See Tex. Bus. & Com. Code Ann. '' 17.45(5), .50(a)(3); Bradford v. Vento,
48 S.W.3d 749, 760 (Tex. 2001) (AUnconscionability under the DTPA is an objective
standard for which scienter is irrelevant.@).  To
prove an unconscionable action or course of action, a plaintiff must show that
the resulting unfairness was glaringly noticeable, flagrant, complete, and unmitigated.  Ins. Co. of N. Am. v. Morris, 981
S.W.2d 667, 677 (Tex. 1998).








MetLife moved for summary judgment on the Rices= unconscionability claim on a no-evidence
basis.  The evidence that the Rices presented,
viewed in the light most favorable to them, shows that MetLife represented that
Larry had coverage when the Rices did not know that he did not have coverage
under the certificate of insurance, accepted premiums for the alleged
noncoverage for over two years and did not properly refund them until after the
Rices filed their motion for new trial, never sent the Rices written notice of
the termination of Larry=s
coverage when it said that it would, told Glenda that an agent would contact
her about purchasing a personal policy for Larry when an agent never did so,
and therefore left the Rices without an opportunity to obtain coverage for
Larry through MetLife or elsewhere (unless the parties= exchanges created new coverage for Larry in May
2003).  We conclude that these facts
comprise more than a scintilla of evidence of unconscionability under the
standard above and therefore preclude summary judgment.  See Tex. R. Civ. P. 166a(i); Smith,
288 S.W.3d at 424.  Thus, we sustain the
remaining portion of the Rices= fifth point.

Insurance
code

In their sixth point, the Rices assert that the
trial court erred by granting MetLife=s summary judgment motion against their insurance
code claim. The Rices pled that MetLife violated chapter 541 of that code
because it misrepresented Athe insurance policy by making untrue statements
of material fact in regard to the policy@ and by failing Ato disclose material facts in regard to coverage.@ 








The insurance code creates a cause of action for
damages caused by an insurer=s misrepresenting the terms or benefits of an
insurance policy or by an insurer=s engaging in an act Aspecifically enumerated in Section 17.46(b),
Business & Commerce Code, as an unlawful deceptive trade practice.@ Tex. Ins. Code Ann. ' 541.151; see id. ' 541.051(1). 
We have held that the Rices provided more than a scintilla of evidence
that MetLife misrepresented the terms or benefits of Larry=s coverage and that the Rices= detrimental reliance on that misrepresentation
caused them damages by precluding their opportunity to obtain coverage
elsewhere.  Thus, for the same
reasons that we sustained the Rices= fifth point, we also sustain their sixth point
and hold that the trial court erred by granting MetLife=s summary judgment motion as to the Rices= claim under the insurance code.

Breach
of fiduciary duty 

In their seventh point, the Rices contend that
the trial court erred by granting summary judgment against their breach of
fiduciary duty claim.  MetLife moved for summary judgment on the
basis that there is no evidence that it had a fiduciary duty to the Rices.

Where the underlying facts are undisputed,
determination of the existence and breach of a fiduciary duty is a question of
law that is exclusively within the province of the court.  Meyer v. Cathey, 167 S.W.3d 327, 330
(Tex. 2005).

As
we have explained,

Due to its extraordinary nature, the law does not
recognize a fiduciary relationship lightly. 
Therefore, whether such a duty exists depends on the circumstances.

 








Fiduciary
duties may arise from formal and informal relationships and may be created by
contract. . . .  A person is justified in
placing confidence in the belief that another party will act in his best
interest only where he is accustomed to being guided by the judgment or advice
of the other party and there exists a long association in a business
relationship as well as personal friendship. 
Thus, the relationship must exist prior to and apart from the
agreement that is the basis of the suit. 

 

Cotten
v. Weatherford Bancshares, Inc.,
187 S.W.3d 687, 698 (Tex. App.CFort Worth 2006, pet. denied) (emphasis added and
footnotes omitted); see Meyer, 167 S.W.3d at 331 (explaining that
there must be a Aspecial
relationship of trust and confidence@ to create a fiduciary relationship in an
ordinary business transaction).  An
insurer does not generally have a fiduciary duty toward its insured.  See E.R. Dupuis Concrete Co. v. Penn Mut.
Life Ins. Co., 137 S.W.3d 311, 318 (Tex. App.CBeaumont 2004, no pet.) (citing Wayne
Duddlesten, Inc. v. Highland Ins. Co., 110 S.W.3d 85, 96 (Tex. App.CHouston [1st Dist.] 2003, pet. denied)); Garrison
Contractors, Inc. v. Liberty Mut. Ins. Co., 927 S.W.2d 296, 301 (Tex. App.CEl Paso 1996), aff=d,
966 S.W.2d 482 (1998); cf. Berry v. First Nat=l Bank of Olney, 894 S.W.2d 558, 560 (Tex. App.CFort Worth 1995, no writ) (holding that a bank
did not automatically have a fiduciary relationship with its customers and that
the customers therefore had the burden to respond to the bank=s summary judgment motion by providing evidence
of specific facts showing a special relationship).








Glenda said in her affidavit, AI have been a customer of MetLife on several
occasions throughout my life . . . .@  The Rices
have not directed us to any other evidence concerning their relationship with
MetLife apart from the coverage at issue in this case.  We hold that Glenda=s sole statement in her affidavit does not
constitute more a scintilla of evidence that the Rices had a special
relationship of confidence and trust with MetLife to create a fiduciary
relationship.  See Crim Truck &
Tractor Co. v. Navistar Int=l Transp. Corp., 823 S.W.2d 591, 595 (Tex. 1992) (explaining that A[n]either is the fact that the relationship has
been a cordial one, of long duration, evidence of a confidential relationship@), superseded by statute on other grounds as
stated in Subaru of Am., Inc. v. David McDavid Nissan, Inc., 84 S.W.3d 212,
225B26 (Tex.2002). Thus, we hold that the trial
court properly granted summary judgment against the Rices= breach of fiduciary duty claim, and we overrule
their seventh point.

Fraud
by nondisclosure

In their eighth point, the Rices contend that the
trial court erred by granting summary judgment against their fraud by
nondisclosure claim.  They alleged in
their amended petition that MetLife had a duty to disclose the termination of
Larry=s coverage but did not.








Fraud by nondisclosure is a subcategory of
fraud.  Schlumberger Tech. Corp. v.
Swanson, 959 S.W.2d 171, 181 (Tex. 1997). 
AAs a general rule, a failure to disclose
information does not constitute fraud unless there is a duty to disclose the
information. . . .  Whether such a duty
exists is a question of law.@  Bradford,
48 S.W.3d at 755.  

The Rices asserted in the trial court that
MetLife had a duty to disclose the termination of Larry=s coverage under the certificate of insurance
solely because the Rices allegedly had a confidential relationship with
MetLife.[20]
See World Help v. Leisure Lifestyles, Inc., 977 S.W.2d 662, 670
(Tex. App.CFort
Worth 1998, pet. denied) (explaining that a Aparty has an affirmative duty to disclose where
there is a confidential or fiduciary relationship@).  For the
same reasons as those discussed above, we hold that the evidence presented by
the Rices is insufficient to raise a material fact dispute about a confidential
relationship between the Rices and MetLife. Therefore, we hold that the trial
court did not err by granting MetLife=s summary judgment motion on the Rices= fraud by nondisclosure claim, and we overrule
the Rices=
eighth point. 








Damages

In their ninth point, the Rices argue that the
trial court improperly granted MetLife=s summary judgment motion on the ground that they
did not present any evidence of damages.[21]  The Rices pled that they were entitled to
recover the following damages:  (1) A[l]oss of coverage under the policy amounting to
$50,000,@ (2) A[l]oss of opportunity to obtain affordable
alternative coverage,@
(3) A[l]oss of premiums paid to [MetLife],@ and (4) Amental anguish damages.@

We have held that the evidence raises a genuine
fact issue about whether the parties entered into a contract in May 2003 for
Larry=s coverage. Accordingly, we hold that there is a
genuine fact issue about whether the Rices lost the value of that coverage if
MetLife wrongfully canceled it, and we sustain the Rices= ninth point to that extent. 








The Rices have not responded to MetLife=s contention that they presented no evidence of
mental anguish damages.  Also, the Rices
admit that the premiums paid for Larry=s coverage have been refunded.  Thus, we overrule the Rices= ninth point to the extent that the trial court=s order precludes those damage theories.  See Haire v. Nathan Watson Co., 221
S.W.3d 293, 302 (Tex. App.CFort Worth 2007, no pet.) (affirming the trial
court=s decision to grant summary judgment as to claims
that were not challenged on appeal).

However, we conclude that the final statement in
Glenda=s affidavit (that because of MetLife=s actions and the state of Larry=s health, the Rices could not obtain alternative
coverage for him) comprises some evidence of the Rices= remaining damage theoryCloss of the Aopportunity to obtain affordable alternative
coverage.@  Thus, we hold that the trial court could not
properly grant summary judgment on that ground.

For these reasons, we sustain the Rices= ninth point to the extent that it regards
damages related to the loss of their coverage and the loss of their opportunity
to obtain affordable alternative coverage. 
We overrule their ninth point to the degree that it relates to damages
for mental anguish or the return of premium payments.

The Trial
Court=s
Denial of The Rices= Motion for New Trial








In their tenth point, the Rices contend that the
trial court erred by denying their motion for new trial based on newly
discovered evidence that MetLife had deducted premiums from Glenda=s cash fund account rather than correctly
returning them.  Whether to grant a new
trial because of newly discovered evidence Ais within the discretion of the trial court.  To determine whether a trial court abused its
discretion, we must decide whether the trial court acted without reference to
any guiding rules or principles; in other words, whether the act was arbitrary
or unreasonable.@  Hutson v. Tri‑County Props., LLC,
240 S.W.3d 484, 490B91
(Tex. App.CFort
Worth 2007, pet. denied) (footnote omitted). 
The party who seeks a new trial on the ground of newly discovered
evidence must show:  (1) the
evidence has come to light after trial, (2) it was not owing to want of due
diligence that the evidence did not come to light sooner, (3) the new evidence
is not cumulative, and (4) the evidence is so material that it would likely
produce a different result if a new trial were granted.  Id. at 491.








In their motion for new trial, the Rices conceded
that before MetLife filed its motion for summary judgment, its counsel had
given them $2,152.17 for the apparent return of the premiums (and six percent
interest) that they had paid for Larry=s coverage since Glenda=s retirement. 
But the Rices alleged that MetLife had wrongfully removed the money from
Glenda=s cash fund account instead of actually refunding
it.[22]  MetLife filed a response to the motion for
new trial, the trial court held an evidentiary hearing, MetLife filed a
supplemental response, and the trial court denied the motion.

MetLife=s supplemental response establishes that the
premium payments had not been properly refunded to the Rices at the time of the
trial court=s
summary judgment decision.  However, the
response shows that as of July 2009, Glenda=s cash fund account had been fully and correctly
replenished by MetLife to its pre-withdrawal amount.

The Rices argue that the improper refund that had
occurred at the time that MetLife=s summary judgment motion was filed Acaused [the Rices] to not defend . . . the cause
of action Money Had and Received, and amounted to a fraud on the court.@  They
contend that a different result would occur because the trial court Awould be able to judge the case without
considering the false affidavits@ of MetLife that stated that the premiums had
been properly refunded.








We cannot agree with the Rices= assertion that their newly discovered evidence
is so material that it would likely produce a different result.  As to the Rices= money had and received claim, which is based
solely on the nonreturn of the premium payments for Larry=s coverage, the evidence established that at the
time the trial court denied the Rices= motion for new trial, those payments had been
correctly refunded to them.  Thus, the
Rices would not be able to obtain a different result on that claim.  See Everett v. TK‑Taito, L.L.C.,
178 S.W.3d 844, 860 (Tex. App.CFort Worth 2005, no pet.) (AMoney had and received is an equitable action
that may be maintained to prevent unjust enrichment when one person obtains
money, which in equity and good conscience belongs to another.@).  

Similarly, as to the Rices= other claims, if the trial court based all or
part of its decision to grant MetLife=s summary judgment motion on the fact that
MetLife had correctly refunded the premium payments, its decision was not
likely to change.  By the time the trial
court denied the Rices=
motion for new trial, those payments had been correctly refunded.  Finally, although the Rices assert that
MetLife perpetuated a fraud on the court, MetLife=s supplemental response to the Rices= motion for new trial shows that MetLife=s delay in correctly refunding the premium
payments was caused by inadvertent computer errors.








For these reasons, we hold that the evidence that
the Rices attached to their motion for new trial is not so material that it
would likely produce a different result if a new trial were granted and that
the trial court therefore did not abuse its discretion by denying the
motion.  See Hutson, 240 S.W.3d at
490B91.  We
overrule the Rices=
tenth point.

Conclusion








Having overruled the Rices= first, third (in part), seventh, eighth, ninth
(in part), and tenth points, we affirm the trial court=s summary judgment order to the extent that it grants
MetLife=s summary judgment motion as to (1) the Rices= breach of contract claim concerning their
theories about the breach of the certificate of insurance that created Larry=s original coverage, (2) the Rices=  claims
for breach of fiduciary duty and fraud by nondisclosure, and (3) the Rices= damage theories of loss of premiums and mental
anguish. However, having sustained the Rices= second, third (in part), fourth through sixth,
and ninth (in part) points, we reverse the trial court=s order to the extent that it grants MetLife=s summary judgment motion as to (1) the Rices= breach of contract claim as limited to their
theory about the breach of a new, separate agreement for Larry=s coverage beginning in May 2003, (2) the Rices= bad faith, promissory estoppel, DTPA, and
insurance code claims, and (3) the Rices= damage theories regarding their loss of coverage
and loss of opportunity to obtain alternate coverage.  As limited to the portions of the trial court=s order that we reverse, we remand this case for
further proceedings.

 

                                                    

TERRIE
LIVINGSTON

CHIEF JUSTICE

 

PANEL: 
LIVINGSTON, C.J.; DAUPHINOT and GARDNER, JJ.

 

DELIVERED: 
August 31, 2010











[1]During discovery, Glenda admitted that she received the certificate;
her admission does not indicate when she received it.





[2]The Group Universal Life Report shows the values of the coverage and
details financial activity related to the coverage.





[3]MetLife later corrected the effective date of the cancellation of
Larry=s coverage retroactively to March 2003 (the month of Glenda=s retirement). According to MetLife, it discovered its billing mistake
in a records audit. MetLife=s
representative Mark Money swore, A[T]he
dependent spouse coverage must be manually changed in the system.  When Mrs. Rice retired she continued her life
insurance coverage and was billed on a quarterly basis. Mistakenly[,] MetLife=s system was not manually changed to end the dependent spouse coverage
billing.@





[4]See Tex. Bus. & Com. Code Ann. '' 17.41B.63 (Vernon 2002 & Supp. 2009).





[5]See Tex. Ins. Code Ann. '' 541.001B.454 (Vernon 2009).





[6]Waiver is the intentional relinquishment of a right actually known or
intentional conduct inconsistent with claiming that right; estoppel prevents
one party from misleading another to the other=s detriment or to the misleading party=s own benefit.  Id. at
778.





[7]The Rices have asserted that MetLife=s failure to exercise its option to terminate the policy upon Glenda=s retirement, its written affirmation of coverage two months after
Glenda=s retirement, and its acceptance of premiums for over two years
amounted to a waiver of the option.  But
the certificate of insurance does not state that MetLife has an option to
terminate upon Glenda=s retirement; it states that ADependent Term
Insurance will end@ upon retirement.  [Emphasis
added.]





[8]The Rices discuss the waiver and estoppel doctrines in their first
point, in which they contend that the trial court erred by not applying those
doctrines to this case.  To the extent
that the Rices rely on their discussion of waiver and estoppel in their first
point to assert that their claims dependent on the parties= contract should succeed because Larry=s original coverage was extended by an alteration of the certificate
of insurance, we overrule the Rices= first point
for the reasons discussed above. 





[9]We recognize that MetLife has stated that it gave Larry an opportunity
to apply for a personal policy in 2005. 
In MetLife=s summary judgment motion, it stated that it did so Aas a courtesy.@  Because the parties= original insurance contract could not be changed through waiver or
estoppel to end Larry=s original coverage on any date other than Glenda=s retirement, MetLife was not contractually required to extend the
personal policy conversion period that was conditioned on Glenda=s retirement.





[10]Craddock is likewise distinguishable because in Craddock,
the insured did not argue that a new contract had been created but only that
the coverage of his contract with the insurer had been changed by waiver, and
the supreme court stated that Ano
consideration moved@ to the insurer after the gunshot accident for an assumption of
liability.  130 Tex. at 252B55, 109 S.W.2d at 165B67.  Similarly, the insured in Mitchell relied
only on waiver and estoppel and did not contend that a new contract had been
created.  335 S.W.2d at 707.





[11]MetLife relies on the fact that the option that Glenda chose in
response to MetLife=s May 2003 letter stated, ACONTINUE MY
GUL COVERAGE.@ But we conclude that MetLife=s letter may reasonably
be read to also give Glenda the option of continuing Larry=s coverage because the  top
right-hand corner of the letter specifically showed that his coverage was still
effective, the letter told Glenda that her Acurrent
coverage [would] remain effective,@ and it stated
she would continue to pay the same premium rates (which included Larry=s premium) as she had when she was employed with Avon.





[12]We note that MetLife=s brief
indicates its belief that the parties had the authority to enter into a new
agreement for coverage after the coverage originally terminated upon Glenda=s retirement.  Specifically,
MetLife concedes in its brief that A[a]lthough
[Glenda=s] retirement date was in 2003 and [Larry=s] right to convert the group dependent life coverage to an individual
policy had expired . . ., MetLife extended the conversion option.@





[13]MetLife did not expressly label its summary judgment motion as to the
Rices= promissory estoppel claim as traditional or no-evidence.  We will treat the motion as a traditional
motion because a no-evidence motion must specify the elements of a claim for
which there is no evidence.  See
Tex. R. Civ. P. 166a(i).





[14]A Apromise@ is a Amanifestation of an intention to act . . . in a specified manner,
conveyed in such a way that another is justified in understanding that a
commitment has been made.@  Black=s Law Dictionary 1332 (9th ed. 2009).





[15]MetLife does not expressly challenge the reliance element in the
portion of its brief related to the Rices= promissory
estoppel claim; we will address the Rices= reliance on
MetLife=s representation of Larry=s coverage
below when we analyze the trial court=s decision to
grant summary judgment on some of the Rices= other claims.





[16]MetLife also argues in response to some of the Rices= other points that they were deemed to know the contents of their
policy.  For the same reasons that we
decline to accept MetLife=s reasoning as to the Rices= promissory
estoppel claim, we also decline to do so as to those points.   





[17]MetLife contends that the Acrux of [the
Rices=] claims under the DTPA is MetLife=s alleged
wrongful termination . . . as opposed to misrepresentations.@  But the Rices= appellate brief and their summary judgment response show that they
base their DTPA claims on MetLife=s May 2003
letter, MetLife=s conversation with Glenda, and MetLife=s acceptance of quarterly premium payments.





[18]The parties agreed during oral argument that the premium payments have
now been properly refunded to the Rices.





[19]The supreme court has held that courts may not consider evidence that
is attached to a movant=s no-evidence summary judgment motion unless the evidence Acreates a fact question.@  Binur v. Jacobo, 135 S.W.3d 646, 651
(Tex. 2004); see Garcia v. State Farm Lloyds, 287 S.W.3d 809, 816 (Tex.
App.CCorpus Christi 2009, pet. denied).

 





[20]We have held that a duty to disclose may arise from circumstances
unrelated to a confidential or fiduciary relationship between the parties. See Citizens
Nat=l Bank v. Allen Rae Invs., Inc., 142 S.W.3d
459, 477 (Tex. App.CFort Worth 2004, no pet.) (op. on reh=g).  However, issues that are
not presented to the trial court Ashall not be
considered on appeal as grounds for reversal.@ Tex. R. Civ. P. 166a(c); see Head v. U.S. Inspect DFW, Inc.,
159 S.W.3d 731, 740 n.6 (Tex. App.CFort Worth
2005, no pet.).





[21]MetLife moved for summary judgment on the ground that its actions did
not cause damages generally; MetLife did not assert that the Rices had to
present evidence of a particular amount of damages.





[22]The cash fund accountClabeled by
MetLife as the AAccumulation Fund@Cincludes money
from premium payments in excess of the cost of the insurance.  Glenda swore in an affidavit,

 

The cash-fund account was funded with money [she] had paid in to cover
future premiums, and was not at all related to prior premiums [she] had
paid.  It . . . became obvious to me that
MetLife had taken my own money . . . and sent it to me to make me believe that
they had actually refunded the premiums . . . .

 

. . . .

 

. . .  In
short, I had to pay MetLife for life insurance that MetLife says never existed,
and then I had to pay myself for the refund of my premiums.